# ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

MAY 4 2012

U.S. COURT OF
FEDERAL CLAIMS

NORTHROP GRUMMAN SYSTEMS
CORPORATION,

       Plaintiff,

v.

THE UNITED STATES OF AMERICA,

       Defendant.

Case No. 12-**12 - 286 C**

## COMPLAINT

Northrop Grumman Systems Corporation, by counsel, for its Complaint against the
United States of America, alleges as follows:

### PARTIES

1.    Plaintiff Northrop Grumman Systems Corporation ("NGSC") is a California corporation
with its principal place of business at 2980 Fairview Park Drive, Falls Church, Virginia
22042-4511. NGSC operates multiple facilities, including one located at 7040C Troy
Hill Drive, Elkridge, Maryland 21075-1204, from which NGSC has performed contracts
for the United States Postal Service.

2.    Defendant is the United States of America (the "Government"), acting by and through the
United States Postal Service (the "Postal Service").

### JURISDICTION

3.    This Court has jurisdiction over the subject matter of this action pursuant to the Tucker
Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 7101-7109.

## BACKGROUND

4.  This action arises from the acts and/or omissions of the Postal Service leading to delays and disruption, breaches of, and constructive changes to, a valid and binding firm fixed-price contract between the Parties for the production of the Flats Sequencing System ("FSS"), Contract 3AAFLT-07-B-0004 (hereinafter alternatively referred to as the "Contract" or the "Production Contract").

5.  The FSS is the next generation of automatic delivery point sequencing equipment designed to reduce the processing cost of flat mail ("flats"). The term "flats" includes large envelopes, magazines, and other kinds of mail that are widely distributed.

6.  The FSS is a massive system of machines. It is approximately the length, and one-half the width, of a football field. It consists of several key subsystems, including the Stand-Alone Mail Preparation subsystem, automatic high-speed Feeders and In-Feed lines, the Carousel sorter, the Tray Staging area, the Integrated Tray Converter, and Software and Electrical subsystems.

7.  The FSS Program was part of the Postal Service's five-year transformation plan, which included the FSS Prototype and Pre-Production Contracts (collectively, Contract 3AAERD-04-B-0506, as amended), as well as the FSS Production Contract, all of which were awarded to Northrop Grumman.

8.  Immediately following execution of the Production Contract in February 2007 and continuing through the end of Program deployments in mid-2011, the Postal Service improperly wrested design control from NGSC, ignored the performance specifications on which the firm fixed-price Production Contract had been based, persistently and pervasively imposed extra-contractual design requirements on NGSC, and otherwise

interfered with NGSC's performance. Contrary to the terms of the Production Contract, the Postal Service treated the Contract as a "build-to-suit" development enterprise.

9.   The Postal Service's acts and omissions addressed herein proximately caused significant delay and disruption to the Production Contract. NGSC did not contribute to or concurrently cause the delays for which relief is sought herein.

10.   On March 31, 2009, in accordance with the requirements of Modification No. 007 to the Production Contract, NGSC submitted to the Postal Service a claim for increased costs and schedule delays caused by the Postal Service's acts and omissions that occurred on or before September 30, 2008.

11.   On July 8, 2010, NGSC certified that claim and submitted it to the Postal Service (the "First Certified Claim"). The First Certified Claim seeks an adjustment under the Production Contract in the amount of $43,795,654 as well as schedule relief for the impact of acts and omissions of the Postal Service that occurred on or before September 30, 2008.

12.   On October 22, 2010, NGSC updated the First Certified Claim, reducing the First Certified Claim by $26,991, leaving the total amount of the First Certified Claim at $43,768,663.

13.   On May 9, 2011, the Postal Service's Contracting Officer issued a Final Decision ("the Final Decision"), rejecting almost completely the First Certified Claim.

14.   NGSC hereby takes a timely appeal from the Contracting Officer's Final Decision rejecting NGSC's First Certified Claim.

15.   On September 24, 2010, in accordance with the requirements of Modification No. 017 to the Production Contract, NGSC submitted to the Postal Service a claim for increased

costs and schedule delays caused by the Postal Service's acts and omissions that occurred after September 30, 2008.

16. On August 3, 2011, NGSC certified its September 24, 2010 claim and submitted it to the Postal Service (the "Second Certified Claim"). The Second Certified Claim seeks an adjustment under the Production Contract in the amount of $71,693,402 as well as schedule relief for the impact of certain acts and omissions of the Postal Service that occurred after September 30, 2008.

17. On October 28, 2011, NGSC submitted to the Postal Service a third certified claim in the amount of $63,433,909.73, for the Postal Service's deliberate and improper non-payment of invoices submitted under the Production Contract and its repudiation of any further payment obligations under the Contract (the "Third Certified Claim").

18. On April 13, 2012, the Postal Service's Contracting Officer issued a Final Decision ("the April 2012 Final Decision"), that: (a) rejected almost completely the Second Certified Claim; (b) asserted Postal Service claims in the aggregate amount of $410,750,738; (c) set off the full amount of NGSC's Third Certified Claim against those Postal Service claims; and (d) asserted a net claim against NGSC in the amount of $341,209,268.

19. NGSC hereby takes a timely appeal from the April 2012 Final Decision.

20. The Postal Service has issued a Contracting Officer's Final Decision with respect to its claims against NGSC, and NGSC, in this complaint, has appealed from the April 2012 Final Decision in its entirety. Nonetheless, based on the decision of the Court of Appeals for the Federal Circuit in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010), NGSC, on May 3, 2012, submitted a Fourth Certified Claim to the

Postal Service.  The Fourth Certified Claim disputes the claims asserted by the Postal

Service in the April 2012 Final Decision and the demand for payment set forth therein.

21.    Although the Postal Service's Contracting Officer has already issued a final decision with

respect to all of the issues that are the subject of the Fourth Certified Claim, the Postal

Service has not yet rendered a final decision that responds to NGSC's May 3, 2012

submission.

## FSS PRE-PRODUCTION CONTRACT

22.    The Pre-Production phase of the FSS Program began on March 8, 2006, with

Modification No. 6 to the FSS Prototype Contract (Contract 3AAERD-04-B-0506).

23.    The Pre-Production phase of the FSS Program contemplated the development and

delivery of a single Pre-Production FSS machine and a Technical Data Package that

would define the baseline that NGSC would then use to perform the Production phase of

the FSS Program.

24.    This objective of the FSS Pre-Production Contract was expressly stated by the Postal

Service in its response to the first set of technical questions exchanged between the

Parties: "The objective of the pre-prod FSS is to be equivalent to a production FSS."

## FSS PRODUCTION CONTRACT

25.    In initially estimating the pricing for the production units of the FSS system that were to

be based on the Pre-Production units being developed under the Pre-Production Contract,

NGSC informed the Postal Service that the Production Contract would be priced at

approximately $1.3 billion.  The Postal Service indicated to NGSC that this cost was too

high and that the Postal Service would work with NGSC to reduce the scope of the

Production Contract in order to reduce the cost.

26.     In mid-2006, the Parties reviewed, evaluated, and discussed the proposed Statement of
        Work for the Production Contract, and NGSC conducted an analysis, commonly referred
        to by the Parties as the "design-to-cost" exercise, to reduce the scope, and hence, the cost,
        of the system.

27.     The Postal Service argued for the proposed reductions in cost, in part, based on its
        representations that: (a) the stable design that would result from the Pre-Production
        Contract would eliminate virtually all of the cost risk associated with the Production
        Contract; (b) the Postal Service would continue to cooperate with NGSC as it had on
        other contracts; and (c) the Postal Service would accord NGSC the design deference to
        which NGSC was entitled under the performance specification for the Production
        Contract.

28.     NGSC reasonably relied upon these representations from the Postal Service.

29.     As a result of the foregoing representations during the negotiations, NGSC agreed to a
        firm fixed-price of $874 million, a reduction of approximately $412 million from the
        initial NGSC estimate.

30.     The FSS Production Contract was executed on February 23, 2007 as an $874 million firm
        fixed-price contract for the production and deployment of 100 FSS units at 32 sites
        around the country, and for an additional 2 FSS units at the Postal Service's training
        facility in Norman, Oklahoma.  The Contract also required NGSC to deliver spares,
        training, maintenance, and certain FSS maintenance Handbooks.

31.     The FSS Production Statement of Work is incorporated into the Production Contract and
        contains a performance specification.

32.    The Award Data Sheet, attached to the executed Production Contract in February 2007

memorialized the Parties' agreement that NGSC would receive from the Pre-Production

contract, within six months of Contract award, a substantially complete and stable

Technical Data Package and other information, engineering, materials, and completed

systems necessary for the performance of the Production Contract.  NGSC reasonably

relied on that agreement in pricing the Production Contract.  As a result of the Postal

Service's acts and omissions, this stable baseline and other information was not available

within six months of the award of the Production Contract.

33.    The Production Contract and the attached Award Data Sheet recognized the criticality of

NGSC having a substantially complete and stable Pre-Production technical baseline prior

to the start of manufacture under the Production Contract.

34.    The Parties negotiated, and ultimately incorporated into the Production Contract, Special

Provision 3-55, "Co-Dependency/Cooperation."

35.    The Co-Dependency/Cooperation Clause, set forth below in its entirety, states:

> The parties acknowledge that they have awarded this Production
> contract prior to the completion of the Pre-Production contract (no.
> 3AAERD-04-B-0506) which was intended as a risk reduction
> activity benefiting the USPS. Accordingly, if the Postal Service
> terminates the Pre-Production contract described above in whole or
> in part, suspends performance or delays performance, the Postal
> Service shall be liable to the supplier for equitable adjustments to
> the Production contract cost, or schedule or both, as appropriate.
> To support such equitable adjustments, the supplier will have to
> demonstrate that, as a result of termination, suspension or delay,
> the supplier will not have engineering, information, materials and
> completed systems needed for the FSS Production contract, that
> supplier intended to obtain such information from the Pre-
> Production contract and that the supplier has not included such
> costs in the Production contract. The parties agree any equitable
> adjustment to the Production contract cost or schedule is intended
> to make the supplier whole for the additional cost incurred by the
> supplier, including overhead and profit that is directly attributable

to the termination, suspension or delay in the Pre-Production contract.

36.     The Parties also negotiated another special provision, Special Clause 3-54 ("SCM

Initiatives") of the Production Contract, which provides:

> It is the policy of the Postal Service to establish strong, mutually beneficial relations with its suppliers in order to meet its business with competitive objectives. Postal Services purchases are intended to foster partnerships with suppliers in which both partners work toward a common goal. The Postal Service has identified the supply management philosophy as central to its efforts to lower overall costs and to further its competitive and business objectives. Supply Chain Management (SCM) integrates the analysis of its purchase process and the supply stream, from the supplier's suppliers to the Postal Service's use and disposal, in order to improve supply stream relationships, increase customer satisfaction, and reduce overall costs. As such the Postal Service expects the supplier to team with it both prior to and after contract award to maximize value and cost savings throughout the supply chain.

37.     As a direct result of the mutual understandings regarding, *inter alia*: (a) the performance

specification on which the Production Contract was based; (b) the timely availability of

necessary information to support the construction of the FSS systems; (c) the contractual

partnership relationship that would obtain; and (d) the contractual protection afforded to

NGSC should these agreements be breached, the Postal Service derived a pricing benefit

of approximately $412 million.

38.     The Production Contract also includes a "Suspensions and Delays" provision at Section

3.05, Clause B-16, which states, in pertinent part:

> If the performance of all or any part of the work of this contract is suspended, delayed, or interrupted by ... a failure of the contracting officer to act within the time specified in this contract – or within a reasonable time if not specified – an adjustment will be made for any increase in the cost of performance of this contract caused by the delay or interruption (including the costs incurred during any suspension or interruption). An adjustment will also be

made in the delivery or performance dates and any other contractual term or condition affected by the suspension, delay, or interruption.

39.    The Production Contract also includes a "First Article Approval" clause at Section 3.21,

Clause 2-5, which sets forth the Parties' obligations when conducting any First Article or

follow-on tests.

40.    The Production Contract further includes a "Changes" provision at Section 3.31(c),

Clause 4-1, "General Terms and Conditions," which provides that if a change "affects the

cost of performance or the delivery schedule, the contract will be modified to effect an

equitable adjustment."

41.    The Production Contract also includes other provisions relating to Payments (Section

3.31, Clause 4-1(i)) and Interest (Section 3.07, Clause B-22).

## DELAY AND DISRUPTION RESULTING FROM POSTAL SERVICE ACTS AND OMISSIONS ON OR BEFORE SEPTEMBER 30, 2008

42.    After the Production Contract was negotiated and executed, the Postal Service abandoned

and repudiated its contractual obligations, particularly relating to the performance

specification and its obligations under the Co-Dependency, SCM Initiatives, and

Suspensions and Delays clauses, as well as its covenant of good faith and fair dealing and

its duty to cooperate. In lieu of its contractual obligations, the Postal Service treated the

Production Contract as a full-scale development, "build-to-suit" contract under which it

was free to control the product design, contract performance, pace, and other

requirements. For example:

a.    The Postal Service's actions caused the issuance of more than 1,700 engineering

Action Items under the Production Contract in the first two years of Contract

performance. Many of these Action Items involved intensive extra-contractual

engineering and design efforts and resulted in significant increases in the cost of materials far in excess of that required to meet Contract requirements.

b.    The Postal Service further required NGSC to produce extra-contractual prototypes and mock-ups of many of the Postal Service-directed changes before the Postal Service would approve the design change.

c.    The Postal Service also directed NGSC to undertake many extra-contractual studies and analyses related to the design that were not necessary to meet contract requirements.

d.    When responding to the Postal Service's evolving and shifting demands, NGSC was held to and evaluated against indefinite, unpublished, extra-contractual *ad hoc* design standards, as well as the requirements and inspections relating thereto.

e.    Between the date of the award of the Production Contract and September 30, 2008 (and continuing thereafter), the Postal Service required an average of 25 meetings per month, more than one each working day. These formal meetings often included numerous Postal Service representatives making unique, build-to-suit demands that NGSC was forced to address; these extra-contractual demands required NGSC to divert resources needed to perform the Production Contract to deal, instead, with the extra-contractual demands of the Postal Service representatives.

f.    During Contract performance, Postal Service personnel spent virtually every working day in the Company's plant; these representatives interacted directly with Company engineers, interfered with NGSC's performance, and mandated extra-contractual work.

43.    NGSC's Production Contract proposal relied on the Postal Service's representation and directed baseline estimating assumption that the FSS design would be approximately 90% complete at the time of Production Contract award, with the engineering drawings nearly 75% completed in Pre-Production.

44.    During the two years following award of the Production Contract, however, the Postal Service required thousands of changes to the Pre-Production drawings, thereby delaying the availability of the information needed to perform the Production Contract. These Postal Service-required changes to the drawings continued well past the point when the completed, stable Pre-Production Technical Data Package was supposed to have been available to NGSC for use in the manufacture of the FSS units. During that period of time (*i.e.*, the two years following the execution of the Production Contract in February 2007), there were significant design changes far in excess of those that would be expected for a design that was 90% complete and for which 75% of the drawings were completed.

45.    NGSC was not free to ignore the Postal Service's Action Items, its prototype and mock-up demands, its demands for additional studies, its ill-defined and amorphous inspection standards, or the changes that flowed out of the meetings required by the Postal Service. NGSC was also not free to decline to modify drawings as the Postal Service asserted design control over the FSS because the Postal Service refused to accept work and caused further delays whenever NGSC questioned the contractual basis for its actions. The added work required by these various Postal Service actions was not necessary in order for NGSC to meet the Contract requirements.

46.    The Postal Service exercised close design control over the Production Contract, arrogating to itself design prerogatives vested in NGSC by the Contract. This conduct

-11-

resulted in the unavailability to NGSC in a timely manner of vital information without which NGSC could not perform the Production Contract in the manner to which it was entitled.

47.     The Postal Service was aware of the schedule slippage caused by its acts and omissions as soon as three months into Production Contract performance, but failed to allow NGSC to exercise the design control afforded to it by the Contract.  To the contrary, the Postal Service continued to exert inappropriate design control and to demand extra-contractual work, adversely impacting NGSC's performance against the Contract schedule.

48.     These acts and omissions continued throughout Contract performance and adversely affected the full spectrum of NGSC's Contract activity, *e.g.*, engineering, drafting, and hardware, and adversely affected efforts by each of NGSC's Integrated Product Teams for the FSS.

49.     The direct material cost associated with the FSS Production Contract increased dramatically as a result of the combined effect of: (a) the lack of engineering, information, materials, and completed systems from the Pre-Production Contract; (b) the absence of a stable design; and (c) the number of material items that were changed as a result of the Postal Service's acts and omissions.

50.     The additional work that caused the delay and disruption was required by the Postal Service at the direction of the Contracting Officer or by his subordinates at the direction of or with the knowledge, ratification, and/or approval of the Contracting Officer.

51.     The extra work necessitated by these Postal Service acts and omissions was not required by the Contract, resulted in increased costs, disrupted performance, and extended the period required to perform the Contract.

## DELAY AND DISRUPTION RESULTING FROM POSTAL SERVICE ACTS AND OMISSIONS AFTER SEPTEMBER 30, 2008

### Delays Relating To Suspended FSS Deployments

52. Despite the disruption caused by the Postal Service's acts and omissions described above, deployment of the FSS machines began around November 2007 with the deployment of the First Article machine at the Postal Service's Dulles, Virginia Processing and Distribution Center. Deployment of additional FSS machines began around October 2008. The First Article Test on the First Article machine was conducted from November 23, 2008 to December 20, 2008.

53. The Postal Service disapproved the First Article machine in January 2009 and required NGSC to submit an additional First Article for re-testing.

54. In early 2009, NGSC and the Postal Service agreed upon a two-part re-test, which they denominated as "First Article Test 2A" and "First Article Test 2B." The Parties also agreed upon a deployment schedule pending the completion of these tests, which were scheduled for April 2009 and August 2009, respectively.

55. First Article Test 2A was conducted from April 26, 2009 to May 9, 2009. On June 5, 2009, the Postal Service granted "conditional approval" of the First Article Test 2A.

56. Notwithstanding the conditional approval of First Article Test 2A, on June 5, 2009 the Postal Service simultaneously directed NGSC to suspend all further deployments until NGSC had met certain additional enumerated conditions, the most significant of which was added hardware and software functionality to the dispatch functions and to the manifests for the Carrier Automated Street Tray Racks ("CASTR"). This functionality was not required by the Contract.

57.   By letter dated June 19, 2009, NGSC informed the Postal Service that the June 5, 2009 direction to suspend deployment was not authorized by the FSS Production Contract. The letter also reserved NGSC's rights to seek the increased costs associated with the delay and disruption caused by the Postal Service's unilateral decision to suspend deployments.

58.   On September 3, 2009, the Postal Service directed NGSC to resume deployments.

**Delays Relating to Suspended FSS Acceptance Testing**

59.   Although the Postal Service authorized the resumption of deployments in September 2009, it refused to allow NGSC to begin acceptance testing on the deployed machines until NGSC had satisfied the extra-contractual requirement for added functionality related to dispatch and CASTR manifests.

60.   Between June 2009 and June 2010, the Postal Service repeatedly modified its demands for extra-contractual CASTR manifest functionality. Eventually, the Postal Service paid NGSC $4.3 million for the costs of providing the added functionality. But the Parties did not resolve any claims for the delay and disruption associated with the increased functionality demanded by the Postal Service.

61.   The Postal Service's demands with respect to the CASTR manifests were responsible for delays in the initiation of acceptance testing from August 2009 until August 2010 and thereafter for further program delays extending into 2011.

62.   The unilateral deferral of acceptance testing by the Postal Service also delayed and disrupted NGSC's performance. Additionally, the unilateral deferral of acceptance testing deferred the point in time at which the Postal Service was required to assume full ownership responsibilities for the machines, including maintenance responsibilities, and

also improperly extended the period during which NGSC was required to maintain the machines in place at Postal Service facilities.

63.    NGSC did not include the increased costs that were associated with the CASTR manifest changes in the firm fixed-price of the Contract. At the time the Parties entered into the Production Contract, the Postal Service knew or should have known that delaying the FSS program would give rise to increased costs and an extended schedule for NGSC's performance. NGSC has not been compensated by the Postal Service for the costs associated with this delay and disruption.

### Delays Relating to the Postal Service's Extended Deployment Schedule and the Addition of New Deployment Sites

64.    Although the Postal Service authorized NGSC to resume deployments in September 2009, the Postal Service hindered NGSC's ability to regain the schedule it had lost as a result of the June 5, 2009 suspension of deployments by repudiating the then-existing schedule and depriving NGSC of the timely availability of Postal Service sites for installation of the machines. The Postal Service compounded this problem in July 2010 by directing a change to the Contract that increased the number of sites at which machines would be installed from 32 to 47 sites.

65.    The Postal Service's imposition of an *ad hoc* schedule and the significant increase in the number of sites at which the FSS machines would be deployed precluded NGSC from deploying the machines in a timely and efficient manner.

66.    The constraints imposed by the Postal Service on the sequencing, timing, and pacing of the FSS installation process, as well as the Postal Service's directed change to add 15 additional deployment sites, extended the FSS Production Contract schedule until at least July 2011, well beyond the originally expected November 2010 end-date for the Contract.

67.     These changes and delays and their associated disruption resulted in increased costs, including the costs associated with the directed change to add 15 additional deployment sites, and an extension of the contract schedule.

68.     NGSC did not include the increased costs associated with and resulting from the expanded number of deployment sites or the disruption to the deployment schedule in the firm fixed-price Contract.  At the time the Parties entered into the Contract, the Postal Service knew or should have known that any extension of the Contract schedule would give rise to increased costs and an extended schedule for NGSC's performance. Furthermore, NGSC has not been compensated by the Postal Service for the costs associated with these changes, delays or disruption.

### Further Delays Relating to Extra-Contractual Handbook Requirements

69.     NGSC was required by the FSS Production Contract to prepare materials, including electronic Maintenance Series Handbooks, that would be used for Postal Service maintenance training and machine maintenance. Modification No. 007 adjusted some of the milestones for the schedule and established certain requirements relating to the training courses.

70.     By July 2009, NGSC had provided the electronic Handbook maintenance materials that were required for the initiation of Phase III Maintenance Training, and NGSC was prepared to proceed with such training.

71.     The Postal Service, however, suspended the initiation of Phase III Maintenance Training until NGSC had satisfied extra-contractual demands relating to the availability of the Handbook. This action on the part of the Postal Service delayed the initiation of the training until August 10, 2010. Thereafter, the Postal Service disrupted the scheduling of

training sessions by failing to have sufficient numbers of trainees available for the
sessions. Moreover, the improper suspension of such training: (a) delayed acceptance
testing; (b) deferred the point in time at which the Postal Service was required to assume
full ownership responsibilities for the machines, including maintenance responsibilities;
and (c) improperly extended the period during which NGSC was required to maintain the
machines in place at Postal Service facilities.

**Delays Relating to Extra-Contractual Requirements for Training Courses**

72.     NGSC was required by the Contract to develop maintenance training courses. The
        Contract set a ceiling on the amount of course development time that NGSC was
        permitted to use in calculating its proposed price for the training materials. Specifically,
        the Contract stated: "The development of the training will be determined using an
        estimation that shall not exceed 60 hours of development needed for each hour of training
        delivered."

73.     During performance, the Postal Service improperly: (a) asserted control over the design
        of the training materials; (b) applied arbitrary and confusing inspection standards; (c)
        established *ad hoc* and changing requirements; and (d) imposed overzealous and
        untimely inspections by numerous entities and individuals, whose actions in relation to
        the materials were inconsistent. These acts and omissions caused the costs incurred by
        NGSC in the development of the training materials to increase well beyond the 60 hours
        of development for each hour of training set forth in the Contract.

**SEPARATELY PRICED CONSTRUCTIVE CHANGES TO THE FSS CONTRACT**

74.     The Postal Service initiated numerous changes to the FSS – both through express
        direction and also constructive changes. While all of these changes directly contributed
        to the delay and disruption of the FSS Contract, some constructive changes are

-17-

susceptible of discrete pricing exclusive of their associated delay and disruption.  These constructive changes are separately described in paragraphs 75-286 and the constructive change doctrine serves as an alternative and independent basis for recovery by NGSC of these discrete cost impacts.

**1.      Carousel – Belts for the Empty Tray Automated Conveyor Unit**

75.    The Carousel tray handling subsystem incorporates a number of conveyor belts that supply empty output trays to the Sort module.

76.    NGSC's original design used conveyor belts that were 32mm-wide.  After the award of the Production Contract, in September 2007 the Postal Service insisted that NGSC redesign the entire Empty Tray Automated Conveyor unit to include a 50mm-wide belt and also to implement a number of other Postal Service preferences.

77.    This change was not required to meet the Contract requirements.

78.    This change resulted in increased costs, exclusive of associated delay and disruption, of $3,807,360.

**2.      Carousel – Main Sprocket**

79.    The upper and the lower Carousel chains are driven by a seven-foot diameter metal sprocket.

80.    In August 2007, the Postal Service instructed NGSC to change the sprocket so that it would have, among other things, a higher tensile strength.

81.    This change was not required to meet the Contract requirements.

82.    This change resulted in increased costs, exclusive of associated delay and disruption, of $2,493,659.

### 3.   Carousel – Main Bearing Housing

83.   The Carousel main sprocket is installed on top of a large bearing.  The main bearing for both the upper and lower drive modules is installed in a bearing housing.

84.   In May 2007, the Postal Service directed NGSC to make several changes to the bearing housing, which required comprehensive redesign efforts.

85.   Neither the change to the bearing housing nor the subsequent redesign effort was required to meet the Contract requirements.

86.   These changes resulted in increased costs, exclusive of associated delay and disruption, of $1,013,590.

### 4.   Carousel – Upper Tension Panels

87.   The Tension module keeps tension on the Carousel chain and belts and prevents them from loosening.  The exterior of the Tension module is covered by a series of long panels.

88.   In November 2007, the Postal Service directed NGSC to redesign the panels covering the Tension module on the upper Carousel.

89.   The redesign of the Tension module panels on the upper Carousel was not required to meet the Contract requirements.

90.   This change increased NGSC's cost of performance, exclusive of associated delay and disruption, by $10,093.

### 5.   Carousel – Full Tray Automated Conveyor Panels

91.   The Full Tray Automated Conveyor unit is the roller conveyor system that moves trays along the Carousel after the trays have been filled with sorted mail.

92.   In approximately September 2008, the Postal Service instructed NGSC personnel to redesign both the upper and lower Full Tray Automated Conveyor panels.

93.     The redesign of the upper and lower panels on the Full Tray Automated Conveyer was
        not required to meet the Contract requirements.

94.     This change resulted in increased costs, exclusive of associated delay and disruption, of
        $12,981.

**6.      Carousel – Redesign of Access Ladder**

95.     NGSC originally used a free-standing maintenance ladder so that Postal Service
        employees could access the upper Carousel and upper Empty Tray Automated Conveyor
        units for maintenance purposes.

96.     In mid-2007, the Postal Service directed NGSC to redesign the ladder and to develop,
        fabricate, and install associated equipment for the redesigned ladder.

97.     This change was not required to meet the Contract requirements.

98.     This change resulted in increased costs, exclusive of associated delay and disruption, of
        $33,616.

**7.      Carousel – Horizontal Panels**

99.     Horizontal panels cover the top of the mini-carousel, which is a separate module that pre-
        sorts and queues up the mail in buckets before induction into the much larger, main
        carousel.

100.    During mid-2007, the Postal Service required that NGSC increase the weight-bearing
        capacity of certain panels on the mini-Carousel unit.

101.    This change was not required to meet the Contract requirements.

102.    This change resulted in increased costs, exclusive of associated delay and disruption, of
        $215,015.

### 8. Feeder – Increased Height of Guarding

103. Because the Feeder module contains moving parts, NGSC built guard walls to protect operators and maintenance personnel from these moving parts.

104. In August 2007, the Postal Service directed NGSC to redesign the Feeder side guard walls by increasing their height by approximately six inches.

105. This change was not required to meet the Contract requirements.

106. This change resulted in increased costs, exclusive of associated delay and disruption, of $149,524.

### 9. Feeder – Light Curtain Housing Near the Vertical Reciprocating Lift

107. A Vertical Reciprocating Lift acts as an elevator to lower trays to ground-level at the Feeder. The openings around the Vertical Reciprocating Lift are protected by numerous safety features, including light curtains.

108. In March and October 2007, the Postal Service directed NGSC to redesign the light curtain housing.

109. This change was not required to meet the Contract requirements.

110. This change resulted in increased costs, exclusive of associated delay and disruption, of $81,163.

### 10. Feeder – Operator Panel Joysticks

111. The FSS Feeder system uses a small joystick to allow operators to control the placement of the Feeder automated induction paddle.

112. NGSC originally intended to use a particular type of plastic joystick, but in October 2008 the Postal Service directed NGSC to use a different joystick.

113. This change was not required to meet the Contract requirements.

114.   This change resulted in increased costs, exclusive of associated delay and disruption, of $11,109.

**11.   Feeder – Vacuum Sensor**

115.   The Feeder uses a vacuum suction pump to "pull" flats mail forward to the induction site. This vacuum suction pump is monitored by a sensor.

116.   In mid to late-2007, the Postal Service formally directed NGSC to use a different sensor from the analog sensor that NGSC had successfully used on previous Postal Service systems.

117.   This change was not required to meet the Contract requirements.

118.   This change resulted in increased costs, exclusive of associated delay and disruption, of $79,118.

**12.   In-Feed Line – Addition of Postal Service-Preferred Elobau Interlocks**

119.   Safety interlock switches are installed throughout the FSS machine on every maintenance/operator door and cover.

120.   In cooperation with a European manufacturer, Elobau, the Postal Service developed a new interlock device, and in May 2007 the Postal Service directed NGSC to replace the interlock switches NGSC originally intended to use with the new Elobau switches.

121.   NGSC discovered numerous problems with these newly-designed Elobau switches. Overcoming these problems required many hardware modifications of the switches.

122.   Use of the Elobau switch was not required to meet the Contract requirements.

123.   This change, *i.e.*, using the Elobau interlocks and the ensuing correction of defects in the Elobau interlocks, resulted in increased costs, exclusive of associated delay and disruption, of $499,282.

13.   **In-Feed Line – Addition of Grommet Edging**

124.   Throughout the entire FSS machine, cables are fed through routed openings.

125.   In September 2007, the Postal Service directed NGSC to add grommet edges to certain
cable routing openings for the In-Feed lines.

126.   This change was not required to meet the Contract requirements.

127.   This change resulted in increased costs, exclusive of associated delay and disruption, of
$23,945.

14.   **In-Feed Line/Injector Module – Injector Drive Module Access and Interior
Platform**

128.   There is a maintenance access area in the Injector module.  To enter this area,
maintenance personnel must lift a hatch and then step down into an area with grated
flooring.

129.   Between April 2007 and January 2008, the Postal Service directed NGSC to modify the
design of the grated flooring.  The Postal Service also directed other changes to the
access area, including redesign of the removable ladder by which a person would step
down into the maintenance area and redesign of the access hatch.

130.   This change was not required to meet the Contract requirements.

131.   This change resulted in increased costs, exclusive of associated delay and disruption, of
$116,396.

15.   **Stand-Alone Mail Preparation Subsystem – 90° Redesign of Automated
Bundle Separation Unit**

132.   The Automated Bundle Separation Unit lifts bundled mail and dumps the bundles onto
conveyors, subsequently distributing the bundles to the individual preparation stations.

133. In early to mid-2007, the Postal Service directed NGSC to provide a proposal and drawings with dimensions for an Automated Bundle Separation Unit rotated with a 90 degree change in configuration.

134. NGSC solicited, received, and evaluated quotes from its suppliers and provided the Postal Service with a cost proposal for the implementation of the new Automated Bundle Separation Unit configuration. The Postal Service informed NGSC, in August 2007, that it no longer wished to pursue the 90 degree Automated Bundle Separation Unit option.

135. The effort relating to this contemplated redesign of the Automated Bundle Separation Unit was not required to meet the Contract requirements.

136. This effort resulted in increased costs, exclusive of associated delay and disruption, of $152,770.

**16.   Stand-Alone Mail Preparation Subsystem – Manual Tub Scanning**

137. Intake carts containing tubs that are filled with mail are brought to the Stand-Alone Mail Preparation subsystem, where the intake carts are loaded into the Automated Bundle Separation Unit for processing.

138. NGSC's original design utilized a hand-held scanner to read the barcode on each loaded cart as it was brought to the Automated Bundle Separation Unit. In July 2007, the Postal Service directed NGSC to provide a more expensive fixed-unit scanner to scan tubs individually as they were received on the intake cart.

139. This change was not required to meet the Contract requirements.

140. This change resulted in increased costs, exclusive of associated delay and disruption, of $207,322.

### 17.   Stand-Alone Mail Preparation Subsystem – Automated Bundle Separation Unit Side Panels

141.   In order to dump flats mail onto conveyors, the Automated Bundle Separation Unit raises up, tips over, and drops flats mail onto conveyors before dropping back down to a rested position.  NGSC's original design provided two main safety mechanisms that prevented the Automated Bundle Separation Unit from falling when in the "raised position."

142.   In May 2008, the Postal Service directed NGSC to redesign the safety features of the Automated Bundle Separation Unit by, among other things, redesigning the side panels and adding a safety pin.

143.   This change was not required to meet the Contract requirements.

144.   This change resulted in increased costs, exclusive of associated delay and disruption, of $45,405.

### 18.   Stand-Alone Mail Preparation Subsystem – "Soft Landing" Enhancement for the Automated Bundle Separation Unit

145.   Noise tests on the Automated Bundle Separation Unit dumper demonstrated that it satisfied the Contract requirements relating to noise.  The Postal Service nevertheless directed NGSC, in July 2008, to modify the Automated Bundle Separation Unit design so that the dumper would operate more quietly.

146.   This change was not required to meet the Contract requirements.

147.   This change resulted in increased costs, exclusive of associated delay and disruption, of $50,296.

### 19.   Stand-Alone Mail Preparation Subsystem – Raising the Automated Bundle Separation Unit Side Walls

148.   NGSC designed the Bundle Distribution Conveyor on the Stand-Alone Mail Preparation subsystem with side walls.

149.    In May 2007, the Postal Service directed NGSC to increase the height of the side walls in the Automated Bundle Separation Unit tub area by approximately five inches.

150.    This change was not required to meet the Contract requirements.

151.    This change resulted in increased costs, exclusive of associated delay and disruption, of $160,717.

**20.    Stand-Alone Mail Preparation Subsystem – Changes to the Automated Bundle Separation Unit Belts**

152.    In October 2007, the Postal Service directed NGSC to redesign the belts on the Automated Bundle Separation Unit in order to reduce gaps between the belts.

153.    This change was not required to meet the Contract requirements.

154.    This change resulted in increased costs, exclusive of associated delay and disruption, of $4,210.

**21.    Stand-Alone Mail Preparation Subsystem – Automated Bundle Separation Unit Pallet Retention Flippers**

155.    In May 2007, the Postal Service directed NGSC to modify the design for the Automated Bundle Separation Unit to include a new method for holding pallets in place, *i.e.*, to use flippers at either end of the pallet to secure the pallet.

156.    This change was not required to meet the Contract requirements.

157.    This change resulted in increased costs, exclusive of associated delay and disruption, of $78,906.

**22.    Stand-Alone Mail Preparation Subsystem – Changes to the Electrical Cabinets**

158.    There are two electrical cabinets located at the Stand-Alone Mail Preparation subsystem.

159.    In October and November 2007, the Postal Service directed NGSC to implement numerous changes to these electrical cabinets including: (1) modifying the method for

monitoring circuit breakers; (2) adding a voltage indicator; and (3) relocating emergency stops.

160. This change was not required to meet the Contract requirements.

161. This change resulted in increased costs, exclusive of associated delay and disruption, of $115,597.

### 23. Stand-Alone Mail Preparation Subsystem – Automated Bundle Separation Unit Operation and Throughput Studies

162. The Automated Bundle Separation Unit, as originally designed by NGSC, allowed for successful collection and unloading of mail onto conveyor belts for distribution and sorting at the Stand-Alone Mail Preparation stations.

163. In early-2008, the Postal Service directed NGSC to implement many changes to the Automated Bundle Separation Unit in order, for example, to improve cycle time, to collect data on unloader cycle time, to decrease up and down cycle, and to notify the operator when the unloader begins its down cycle.

164. This change was not required to meet the Contract requirements.

165. This change resulted in increased costs, exclusive of associated delay and disruption, of $14,105.

### 24. Stand-Alone Mail Preparation Subsystem – Relocation of Dumper Sight Tube and Hydraulic Assembly

166. NGSC's original design placed a sight tube and a hydraulic assembly on the side of the Automated Bundle Separation Unit near the electrical enclosure.

167. In late-2007, the Postal Service directed NGSC to relocate the dumper sight tube and hydraulic assembly.

168. This change was not required to meet the Contract requirements.

169. This change resulted in increased costs, exclusive of associated delay and disruption, of $36,102.

### 25. Stand-Alone Mail Preparation Subsystem – Vertical Reciprocating Lift at Dolly Maker

170. The Vertical Reciprocating Lift at the Stand-Alone Mail Preparation subsystem raises loaded trays into dollies. The Vertical Reciprocating Lift at the Dolly Maker includes multiple safety precautions, including a locking pin.

171. In late-2007, the Postal Service directed NGSC to redesign the Vertical Reciprocating Lift locking pin.

172. This redesign was not required to meet the Contract requirements.

173. This change resulted in increased costs, exclusive of associated delay and disruption, of $65,838.

### 26. Stand-Alone Mail Preparation Subsystem – Changes to the Individual Package Removal System

174. The Individual Package Removal System collects the waste that accumulates as mail is prepared at the Stand-Alone Mail Preparation stations.  The waste is compacted into a tight bundle and shrink wrapped.

175. In early to mid-2007, the Postal Service directed NGSC to implement a number of changes to this system including: (a) adding a new diagram depicting how to insert the shrink wrap roll; (b) redesigning the Individual Package Removal System so that it did not utilize a "hotwire" to cut the plastic shrink wrap material; and (c) incorporating vertical rather than horizontal belts, an alternate chute size, and a different way of ejecting waste from the unit.

176. This change was not required to meet the Contract requirements.

177.    This change resulted in increased costs, exclusive of associated delay and disruption, of
        $16,710.

### 27.    Stand-Alone Mail Preparation Subsystem – Bundle Distribution Conveyor Catch Pan

178.    The Bundle Distribution Conveyor catch pan collects debris left on the Stand-Alone Mail
        Preparation conveyors after mail has been distributed.  When the catch pan is full, a
        sensor alerts Postal Service personnel.

179.    In December 2007, the Postal Service directed NGSC to redesign the catch pan.  After
        NGSC began implementing the Postal Service's direction, the Postal Service decided not
        to pursue the redesign of the Bundle Distribution Conveyor catch pan.

180.    This change would not have been required to meet the Contract requirements.

181.    The effort to comply with this change prior to the Postal Service decision not to pursue it
        resulted in increased costs, exclusive of associated delay and disruption, of $26,611.

### 28.    Stand-Alone Mail Preparation Subsystem – Commercially Impracticable Test Requirement and Redesign of Automation Compatible Trays

182.    The Automation Compatible Trays are used in the Dolly Dock and the Stand-Alone Mail
        Preparation subsystem where operators prepare mail to be sorted and sequenced.  NGSC
        proposed to use trays made of certain plastics and materials.

183.    Beginning in early-2007 and continuing throughout 2008, the Postal Service directed
        NGSC to redesign the Automation Compatible Trays using different plastics and
        materials in an attempt to meet overly restrictive testing requirements.  The resulting
        trays did not satisfy the testing requirements.  Subsequently, and in part to achieve certain
        extra-contractual requirements that were unrelated to the test in question, the Postal
        Service directed NGSC to use an alternate combination of plastics and materials for the
        trays.  This new design differed both from the design NGSC had originally proposed and

-29-

from the other design previously mandated by the Postal Service. This newly mandated

design also failed to pass the testing requirements.

184.    The non-test-related changes introduced into the second redesign mandated by the Postal

Service were not required by the Contract.  Moreover, none of these changes to the

plastics and materials mandated by the Postal Service satisfied the Contract testing

requirements, which were commercially impracticable as interpreted and implemented by

the Postal Service.  Eventually, the Postal Service accepted and is currently using trays

that did not pass its commercially-impracticable test requirements.

185.    The serial, unsuccessful redesigns mandated by the Postal Service resulted in increased

costs, exclusive of associated delay and disruption, of $166,183.

### 29.    Stand-Alone Mail Preparation Subsystem – Backward Compatibility of the Automation Compatible Trays

186.    The Production Contract required that the Automation Compatible Trays used on the FSS

program be "backward compatible" for use on the predecessor "AFSM 100" systems that

are part of the prior Automated Flats Sorting Machine ("AFSM") programs.  The

Contract also required, however, that the Automation Compatible Trays be able to

accommodate mail larger in size than was accommodated on previous programs.

Accordingly, NGSC proposed Automation Compatible Trays that could accommodate

the larger mail as required and that were compatible with the AFSM 100 machine with

only a minor adjustment to the AFSM 100 machine.

187.    In July 2007, the Postal Service directed NGSC to enhance the backwards compatibility

of the Automation Compatible Trays so that they could be used on the AFSM 100

machines without any additional accommodations to the AFSM 100 machines,

notwithstanding the differences in tray size that resulted from the contractual obligation

to accommodate specified mail sizes. Ultimately, after considerable NGSC effort, the
Postal Service accepted NGSC's original implementation of the backwards compatibility
requirement, which required adjustments to some of the machines, but for which no new
hardware was required.

188. This effort and expense was not required to meet the Contract requirements.

189. This change resulted in increased costs, exclusive of associated delay and disruption, of
$21,268.

### 30.   Stand-Alone Mail Preparation Subsystem – Dolly Labels

190. The dollies transport Automation Compatible Trays from the Stand-Alone Mail
Preparation subsystem to the main FSS machine. Each dolly has a bar on its side.

191. In October 2007 the Postal Service directed NGSC to add a label to the dolly, which
NGSC did by adding a "Lift Here" indicator on the side bar. The Postal Service then
directed NGSC to change the label, and NGSC designed a label that said "Lift Bar Here."
Eventually, in December 2007, the Postal Service decided to eliminate the labels for the
lift bar entirely, thereby reverting to NGSC's original design.

192. This change was not required to meet the Contract requirements.

193. This change resulted in increased costs, exclusive of associated delay and disruption, of
$23,397.

### 31.   Stand-Alone Mail Preparation Subsystem – Removable Frames Surrounding Linear Actuators

194. There are linear actuators located in the Dolly Maker and in various Vertical
Reciprocating Lifts. The linear actuators are enclosed within support frames.

195.    In October 2007, Postal Service personnel directed NGSC to re-design the support frames
        so that the bars in the frame could be removed and disassembled, and so that the linear
        actuators within the support frames could be removed.

196.    This change was not required to meet the Contract requirements.

197.    This change resulted in increased costs, exclusive of associated delay and disruption, of
        $95,665.

### 32.    Automated Tray Management System – Redesign and Prototyping of the Flexible Turning Unit Platform

198.    The Flexible Turning Unit platform leads into the verticalizer area for jam clearance and
        maintenance purposes.

199.    Beginning in August 2007, the Postal Service directed NGSC to redesign the Flexible
        Turning Unit platform. In order to approve the re-design, the Postal Service required
        NGSC to build prototypes. After several rejected designs (including rejected prototypes),
        NGSC eventually proposed a design that satisfied the Postal Service's directions.

200.    The redesign of the Flexible Turning Unit Platform was not required to meet the Contract
        requirements.

201.    This change resulted in increased costs, exclusive of associated delay and disruption, of
        $589,215.

### 33.    Automated Tray Management System – Redesign of the Sliding Door Guard on Stacker/Loader Unit

202.    The Stacker/Loader unit includes sliding doors made of clear polycarbonate and equipped
        with interlock safety switches.

203.    Between March 2008 and January 2009, the Postal Service directed NGSC to redesign
        the sliding doors to use thicker polycarbonate material.

204.    The redesign of the sliding doors was not required to meet the Contract requirements.

205.   This change resulted in increased costs, exclusive of associated delay and disruption, of $84,064.

### 34.   Automated Tray Management System – Conversion of Street Tray Labeler Door

206.   As designed by NGSC, the Street Tray Labeler was contained in a cabinet and accessible by a single door.

207.   In February 2008, the Postal Service directed NGSC to change the single-door design of the Street Tray Labeler to a double-door design.

208.   The redesign of the door was not required to meet the Contract requirements.

209.   This change resulted in increased costs, exclusive of associated delay and disruption, of $62,570.

### 35.   Automated Tray Management System – Conversion of Street Tray Labeler Cabinet

210.   The Street Tray Labeler cabinet was designed with glass panels within the doors and with a 5-inch opening on the back side to provide natural light and visibility into the cabinet interior when the door is closed.

211.   In late-2007, the Postal Service directed NGSC to re-design the Street Tray Labeler cabinet to close the 5-inch opening on the back side of the Street Tray Labeler.

212.   This change was not required to meet the Contract requirements.

213.   This change resulted in increased costs, exclusive of associated delay and disruption, of $21,120.

### 36.   Automated Tray Management System – Relocation of Street Tray Labeler Pneumatic Valve Block

214.   The Street Tray Labeler affixes labels to the street trays using a pneumatic valve block, which was originally designed to be on the outside of the Street Tray Labeler cabinet.

215. In November 2007, the Postal Service directed NGSC to redesign the system so that the pneumatic valve block was enclosed within the cabinet.

216. The relocation of the pneumatic valve block was not required to meet the Contract requirements.

217. This change resulted in increased costs, exclusive of associated delay and disruption, of $48,768.

### 37. Automated Tray Management System – Modification of the Street Tray Labeler Tray Pusher

218. The Street Tray Labeler has a tray pusher that holds the tray in the correct position so that the label applicator can properly affix the label to the street tray.

219. The Postal Service directed NGSC to redesign the Street Tray Labeler's tray pusher so that it applied less force against the tray.

220. This change was not required to meet the Contract requirements.

221. This change resulted in increased costs, exclusive of associated delay and disruption, of $24,390.

### 38. Electrical – Addition of Through-the-Door Disconnects and Voltage Indicators

222. NGSC's original design provided a through-the-door disconnect and voltage presence indicator on the FSS Main electrical cabinet, which satisfied the Contract requirements.

223. Between October 2007 and January 2008, the Postal Service directed NGSC to provide through-the-door disconnects and voltage presence indicators on all electrical cabinets.

224. This change was not required to meet the Contract requirements.

225. This change resulted in increased costs, exclusive of associated delay and disruption, of $106,321.

**39.**   **Electrical – Labels on Electrical Cabinets**

226.   NGSC designed the electrical cabinets with standard government-approved black Hazardous Voltage Warning labels and High Voltage Warning labels, and yellow Arc Flash Warning labels.

227.   Throughout 2007 and 2008, the Postal Service frequently demanded that labels be added and designs be modified to include additional labels.

228.   This change was not required to meet the Contract requirements.

229.   This change resulted in increased costs, exclusive of associated delay and disruption, of $136,470.

**40.**   **Electrical – Addition of Cabinet Name Plates**

230.   For the main FSS electrical cabinets, NGSC prepared name plates that identified the cabinet and described various serialized features of the electrical system running through that cabinet.

231.   In 2008, the Postal Service directed NGSC to provide prominently displayed name plates on the outside of all electrical cabinets, rather than just the main ones.

232.   This change was not required to meet the Contract requirements.

233.   This change resulted in increased costs, exclusive of associated delay and disruption, of $27,497.

**41.**   **Electrical – Addition of Lockable Disconnect Labels**

234.   Certain warning and safety labels are placed around the entire FSS, including lockable disconnect labels.  In February and October 2007, the Postal Service directed NGSC to use a maintenance lockout label that would be provided separately by the Postal Service.

NGSC was eventually forced to purchase additional labels when the Postal Service did not provide the labels it had directed NGSC to use.

235.   NGSC was forced to retrofit existing Production machines with maintenance lockable disconnect labels directed by the Postal Service that NGSC was forced to purchase. NGSC was also forced to alter FSS electrical drawings to accommodate the label change.

236.   None of these changes was required to meet the Contract requirements.

237.   These changes resulted in increased costs, exclusive of associated delay and disruption, of $22,172.

### 42.   Electrical – Movement of FSS Main Control Station Circuit Breaker

238.   The FSS Main Control Station houses computers that control the entire FSS system.

239.   In March 2008, the Postal Service directed NGSC to relocate the FSS Main Control Station circuit breaker.

240.   This change was not required to meet the Contract requirements.

241.   This change resulted in increased costs, exclusive of associated delay and disruption, of $43,387.

### 43.   Electrical – Resizing Indicator Lights on FSS Main Operator Panel

242.   FSS operator panels contain indicator lights.  After having approved tri-color indicator lights for the operator panels, in March 2008 the Postal Service directed NGSC to enlarge the indicator lights.

243.   The change in the size of the indicator lights was not required to meet the Contract requirements.

244.   This change resulted in increased costs, exclusive of associated delay and disruption, of $18,698.

**44.   Expanded Meeting Requirements Regarding the Software Requirements Specification**

245.   NGSC wrote software code to operate the FSS and supported the software code with industry-standard documentation, including a Software Requirements Specification.

246.   After NGSC had prepared and shared initial drafts of its Software Requirements Specification documentation with the Postal Service in summer 2007, the Postal Service improperly rejected NGSC's Software Requirements Specification submittal in August 2007.

247.   Between September and December 2007, the Postal Service required NGSC to meet on an ongoing basis with Postal Service personnel to redefine the content for the Software Requirements Specification based on the Postal Service's improper interpretation of the Contract.

248.   The meetings that attempted to resolve the Postal Service's improper interpretation of the requirements for the Software Requirements Specification were not required because NGSC's previously submitted Software Requirements Specification met the Contract requirements.

249.   Those required meetings resulted in increased costs, exclusive of associated delay and disruption, of $1,681,544.

**45.   Updates Relating to Inventor 10 Software Defects**

250.   The legacy drawings from prior Postal Service programs were originally prepared using a software tool called "Mechanical Desktop," and the Contract allowed the reuse of Mechanical Desktop drawings without modification. The Contract required, however, that all such drawings be converted to the format generated by a newer software tool called "Inventor 10."

251.  In mid-2007, NGSC learned that the various Contract requirements relating to the required format for the drawings and the use of the Inventor 10 software were inconsistent, preventing use of the software as originally anticipated under the Contract.

252.  Although the Postal Service required NGSC to use the Inventor 10 software, the Inventor 10 software proved incapable of converting certain legacy Mechanical Desktop drawings. The Postal Service then directed NGSC to use "Inventor 2009," a newer version of the Inventor software.

253.  In Modification No. 009, the Postal Service agreed to pay for specific costs associated with the upgrades to Inventor 2009, particularly relating to costs for licensing new software and purchasing new computers to run the Inventor 2009 software. This Modification did not address or include additional impacts stemming from the defective Inventor 10 software, including the costs associated with the needless conversion of certain drawings from Mechanical Desktop to Inventor 10, and the sunk costs associated with NGSC's unsuccessful attempts to use the Inventor 10 software for large 3-D models. Modification No. 009 did not release any claims.

254.  The file translation from Mechanical Desktop to Inventor 10 required an extensive drafting effort that was beyond the scope of the Contract. Additionally, significant system administration efforts were required to accommodate difficulties encountered during the Mechanical Desktop/Inventor 10 conversion process.

255.  This effort was required because the Postal Service mandated the use of the defective Inventor 10 software.

256.  NGSC's attempts to comply with the contradictory (and, ultimately, impracticable) provisions of the Statement of Work and the Postal Service's direction to use the Inventor

10 software resulted in uncompensated increased costs, exclusive of associated delay and disruption, of $973,733.

**46.  Electronic FSS Maintenance Series Handbooks**

257.  The Contract called for the delivery of electronic Maintenance Series Handbooks, which were to set out the maintenance and operations procedures for the FSS.  The electronic Maintenance Series Handbooks were required to depict the entire FSS machine and to describe in detail every material part of the FSS machine.

258.  Postal Service acts and omissions changed the Contract with regard to the electronic Maintenance Series Handbooks.  As described below in paragraphs 259-272, the Postal Service's acts and omissions included the following:

a.  Beginning in early to mid-2007, the Postal Service failed to make available on a timely basis certain key materials – the Handbook Development Guide and the electronic architecture framework for the Handbooks – both of which were necessary to define the specific content, format, and framework for the final electronic Handbooks.

b.  Throughout 2007 and 2008, the Postal Service's actions delayed the availability of certain key logistics information that was to be the primary source for the electronic Handbooks.

c.  Throughout 2008, the Postal Service delayed the availability of the Logistics Reference System, a functional FSS machine that demonstrated how the hardware was actually configured and that was necessary so that NGSC could test the Handbook maintenance procedures on an actual machine prior to including the procedure in the Handbooks.

d.  Between 2007 and 2009, the Postal Service refused to make a final decision on the
    requirements for the Functional Block Diagrams and gave NGSC inconsistent
    directions relating to the Functional Block Diagrams that should be used in the
    Handbooks.

e.  Between July 2007 and late-2008, the Postal Service required NGSC to use the
    defective Inventor 10 software.

f.  Between 2007 and 2009, the Postal Service failed to have representatives on site at
    NGSC who had the ability to address, resolve, and eliminate the above-described
    inconsistencies and disruptive events.

**Failure to Make Key Electronic Materials Available**

259.   Although the Contract required the Postal Service to provide a reliable Handbook
       Development Guide in a timely manner, the Postal Service failed to do so. Instead, it
       provided a Handbook Development Guide that would have been appropriate for a hard-
       copy Handbook, but which was inappropriate guidance for the contractually-required
       electronic Handbooks. While the Postal Service eventually provided a more appropriate
       Handbook Development Guide in July 2007, even that did not include all of the
       information required to format and prepare content for the contractually-required
       electronic Handbooks.

260.   The Postal Service also failed to specify the requirements for the electronic formatting (or
       "schema") for the Handbooks in a timely manner, delaying NGSC's ability to proceed
       with the appropriate electronic framework for the Handbooks. The Postal Service did not
       finalize the Handbook schema until September 2009.

261.    By delaying decisions on the electronic formatting requirements to 2008 and 2009, the
        Postal Service prevented NGSC from proceeding with the Maintenance Series
        Handbooks in a timely manner.

                     **Failure to Make Logistics Information Available**

262.    Due to the delays on the Pre-Production contract throughout 2007 and 2008, the Postal
        Service failed to provide and impeded the timely availability of key logistics information
        that was to be the primary source data for the Handbook.  This included: (a) the
        Technical Data Package design drawings for the Production machine, which drawings
        were one of the key inputs for the Handbooks; and (b) reliability and maintainability data,
        which were critical for NGSC's determination of the types of procedures that would be
        needed to make the Handbooks effective.

                   **Failure to Have a Logistics Reference System Available**

263.    The Postal Service's actions also precluded the timely delivery of a Logistics Reference
        System, which was critical to NGSC's ability to write the appropriate content for the
        Handbook and to verify that the content and instructions in the Handbooks were correct.

264.    The Logistics Reference System was not delivered until nearly twelve months later than
        originally planned – late-2008, as opposed to the originally expected delivery in late-
        2007.  But even after the delivery of the Logistics Reference System, the hardware and
        software design of the FSS continued to evolve due to acts and omissions of the Postal
        Service, undermining the utility of the late-delivered Logistics Reference System and
        causing the Handbook effort to increase.

265.    This protracted evolution in the FSS hardware and software design caused schedule
        delays and disruption and required NGSC to rework the content of the Handbooks that

had previously been developed once the Logistics Reference System finally became available in a stable configuration.

### Failure to Clarify Functional Block Diagram Requirements

266.   Due to persistent internal disagreements within the Postal Service concerning the specifications for the Functional Block Diagrams and the Postal Service's inability to reach a final decision on which types of functions it wanted the Functional Block Diagrams to display, the Handbook development effort increased significantly between 2007 and 2009.

267.   The delays between 2007 and 2009 associated with the Postal Service's failure to clarify the Functional Block Diagram requirements substantially disrupted the Contract and increased NGSC's costs, delayed the schedule, and negatively impacted NGSC's training development efforts.

### Requirement to Use Defective Inventor 10 Software

268.   Between July 2007 and late-2008, the unanticipated capacity limitations of the Inventor 10 software tool, which the Postal Service contractually obligated NGSC to use, increased the effort required to produce the Handbooks and also caused delivery of the Handbooks to be delayed.

269.   The Postal Service failed to identify or provide the appropriate software tool so that drawings could be converted for use in the Handbooks at the level of detail specified in the Contract, without additional drafting effort to revise drawings. These Inventor 10 limitations negatively impacted drafting of the Handbook by causing iterative development and re-development of the necessary documentation.

**Failure to Manage the Program Effort Effectively**

270.    Between 2007 and 2009, the Postal Service failed to cooperate with NGSC in advancing

the Handbook development in line with the overall FSS schedule.  The Postal Service's

failure to cooperate and failure to effectively manage the program significantly

undermined NGSC's ability to develop the Handbooks.

**Summary of Handbooks Impacts**

271.    Except for those changes required to address conflicting requirements in defective

specifications furnished by the Postal Service (namely the Inventor 10 defects described

in paragraphs 268-269), none of the foregoing changes relating to the Handbooks was

required to meet the Contract requirements.

272.    Combined, the foregoing acts and omissions on the part of the Postal Service

constructively changed the FSS Production Contract and forced NGSC to incur

significant additional costs relating to Handbook development.  Between February 2007

and October 2009, the additional costs related to Handbook development totaled

$11,810,749.

**47.    Mission Assurance and Non-Conforming Materials**

273.    As part of NGSC's quality control program, the NGSC Mission Assurance team

originally intended to manage all non-conforming materials consistently with the level of

support previously provided by NGSC on a similar Postal Service program (AFSM-ai,

Automated Flats Sorting Machine-automatic induction), scaled for the FSS Production

Contract.

274.    Due to the combined impact of the Postal Service acts and omissions described

throughout this Complaint, NGSC was required to add infrastructure and resources that

were unforeseen when the Production Contract was signed. For example, as the Postal Service's design requirements continued to change, material that met the Contract requirements as originally specified became non-conforming material due to the intervening design changes. Consequently, there were much greater quantities of non-conforming material than originally envisioned. This forced NGSC to create an additional infrastructure to manage the materials.

275. This growth in effort relating to the Mission Assurance team and management of non-conforming materials resulted in a change to the Contract.

276. As a result of these changes, NGSC incurred increased costs, exclusive of associated delay and disruption, of $361,088.

**48.    Training Materials**

277. As noted above in paragraph 72, the Contract set a limit on the amount of time that NGSC was permitted to use in calculating its price for the development of the training materials. Specifically, the Contract stated: "The development of the training will be determined using an estimation that shall not exceed 60 hours of development needed for each hour of training delivered."

278. Notwithstanding the Contract, the Postal Service's assertion of control over the design of the training materials, its arbitrary and confusing inspection standards, its shifting requirements with respect to the training materials, and its overzealous, untimely, and inconsistent inspection of these materials caused NGSC to expend approximately 165 hours of development for each hour of training delivered pursuant to the Contract.

279. Changes to the training materials demanded by the Postal Service throughout the life of the Contract were not required to meet the requirements of the Contract.

280.    The Postal Service's acts and omissions caused NGSC to incur added costs in the development of training materials in the amount of $4,737,855 (exclusive of associated delay and disruption) and extended the period required for the performance of the Contract.

### 49.    Increased Storage, Warehousing, and Transportation

281.    NGSC originally planned for storage, warehousing, and transportation of FSS materials prior to shipping the material to the various deployment sites. The storage and transportation needs were based on the Contract deployment schedule.

282.    When the Postal Service suspended machine deployments in June 2009 and thereafter modified the deployment schedule and added 15 deployment sites, NGSC incurred additional costs in the amount of $5,047,694 (exclusive of associated delay and disruption) relating to storage, warehousing, and transportation of the FSS materials.

### 50.    Increased Spares and Inefficiencies in Purchasing Spares

283.    The Production Contract requires NGSC to provide spare parts kits at each FSS deployment site, as well as spare parts kits to be held at Postal Service depots that include additional spare parts beyond those kept at the individual deployment sites.

284.    The Postal Service's July 2010 direction to add 15 deployment sites and its other acts and omissions throughout 2009 and 2010 that extended the period for performance of the Contract required NGSC to provide additional spares and to change its plan for ordering spare parts.

285.    This change was not required to meet the requirements of the Contract as initially awarded.

286.    This change caused NGSC to incur increased spare parts costs in the amount of
        $7,086,977 (exclusive of associated delay and disruption) and extended the period
        required for the performance of the Contract.

## NON-PAYMENT OF INVOICES

287.    The Contract required NGSC to submit invoices to the Postal Service to receive payment,
        which NGSC regularly did between February 2007 and the present time.

288.    These invoices were for amounts properly due to NGSC under the Contract, whether for
        services rendered, deliveries made, or milestones accomplished by NGSC.

289.    Beginning in early 2011, the Postal Service failed to pay NGSC on invoices that were
        properly submitted. On July 11, 2011, the Postal Service informed NGSC that the Postal
        Service intended to withhold all further payments to NGSC under the Contract.

290.    The current definitized contract value for the firm fixed-price Contract (including
        Modifications that increased the total contract value from approximately $874 million) is
        $902,352,049.00. To date, the Postal Service has paid NGSC only $838,918,139.27,
        leaving $63,433,909.73 due to NGSC against the definitized Contract value.

291.    NGSC has submitted to the Postal Service invoices and payment requests for the
        remaining $63,433,909.73, but the Postal Service has refused to pay and has repudiated
        any further obligation to pay NGSC under the Contract.

292.    NGSC is entitled to payment on the $63,433,909.73 balance of the definitized Contract
        value.

## THE POSTAL SERVICE'S CLAIMS

293.    The April 2012 Final Decision asserted claims against NGSC that the Postal Service
        quantified in the aggregate amount of $410,750,738.

294.    The April 2012 Final Decision asserts entitlement to retain, as a credit against the Postal Service's claims, the $63,433,910 due and owing to NGSC under the Contract, payment of which is the subject of NGSC's Third Certified Claim, and $6,108,100 determined in the April 2012 Final Decision to be due and owing against NGSC's Second Certified Claim. Net of these asserted credits, the amount claimed by the Postal Service is $341,209,268.

295.    The Postal Service claims are based on the alleged loss of use of the FSS machines due to late delivery, alleged deficiencies in documentation and deliverables furnished by NGSC, disputes relating to the required complement of spare parts, retesting costs, and potential warranty issues relating to both hardware and software.

296.    The Postal Service claims are based on: (a) alleged deficiencies in NGSC's performance that were caused by acts or omissions of the Postal Service that adversely affected NGSC's performance and for which NGSC is entitled to additional compensation and schedule relief, as explained in Paragraphs 1-292 above; (b) misinterpretations of Contract terms and conditions; (c) unilateral determinations that the Contract does not authorize the Postal Service to render; (d) asserted damages that were not proximately caused by any act or omission of NGSC; and (e) damages calculations that are speculative. For these and other reasons, the Postal Service's claims are unmeritorious in fact and in law.

## COUNT I
### Cardinal Change

297.    NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

298.  The Postal Service's actions described above materially and fundamentally altered the nature of the work bargained for by the Parties under the firm fixed-price Production Contract.

299.  The Postal Service managed the Contract as if it were a cost-reimbursable, full-scale development contract. In so managing the work, asserting control over the design, and imposing a multitude of sometimes inconsistent constructive changes and detailed design requirements, the Postal Service restructured the Contract from one based on a performance specification to one based on subjective design standards promulgated by the Postal Service iteratively and at its discretion. These changes, which were beyond the scope of the Changes clause of the Production Contract, wrongly wrested control of the Production design from NGSC and transformed the performance specification into design-to-suit requirements, ill-suited for a firm fixed-price structure and inconsistent with the Postal Service's requirements for this fixed-price contract.

300.  For the reasons set forth above, the Postal Service required NGSC to perform a materially different type of contract and work under materially different conditions than originally bargained for by the Parties, thereby effecting a cardinal change to the Production Contract.

301.  Accordingly, NGSC is entitled to reformation of the Production Contract to a cost-plus-fixed-fee structure, pursuant to which NGSC shall be reimbursed for all allowable and reasonable costs allocable to the Contract and incurred in connection with its performance from the initiation of performance through completion, plus a reasonable fee thereon.

## COUNT II
### Breach of Contract

302. NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

303. The Production Contract was a valid contract between the Postal Service and NGSC.

304. The Postal Service had an obligation to perform consistently with its obligations under the Production Contract. Such obligations are outlined in the Production Contract in, *inter alia*, the following contract clauses:

    a. 3.05, Clause B-16, Suspension and Delays

    b. 3.21, Clause 2-5, First Article Approval – Postal Service Testing

    c. 3.31, Clause 4-1(i), Payments

    d. 3.54, SCM Initiatives

    e. 3.55, Co-Dependency/Cooperation

    f. Clause B-22, Interest

    g. Modification No. 007, Paragraph 6

    h. The Contract deployment schedule

305. Additionally, the Postal Service had an obligation to perform consistently with its implied duties and obligations under the Production Contract, including: (a) the duty of good faith and fair dealing; and (b) the duty to cooperate.

306. The Postal Service materially breached these contractual obligations, *inter alia*, by:

    a. Significantly interfering with NGSC's performance;

    b. Failing to abide by the performance specification of the Contract;

c.  Providing NGSC with extra-contractual direction and design changes that required NGSC to perform an unreasonable amount of non-recurring engineering and production work simultaneously;

d.  Frustrating and precluding the timely availability of the engineering, information, materials, and completed systems necessary for NGSC's performance of the Contract;

e.  Improperly suspending deployments;

f.  Preventing testing and delivery of completed machines;

g.  Adjusting the Contract schedule;

h.  Preventing recovery of the Contract schedule with accelerated deployments;

i.  Failing to act within a reasonable time;

j.  Suspending, delaying, and interrupting NGSC's performance;

k.  Disrupting the schedule relating to Handbook and training requirements;

l.  Refusing to accept Handbook and training materials that satisfied the contract requirements;

m.  Imposing extra-contractual requirements;

n.  Failing to grant an equitable adjustment to the contract price and schedule when required to do so under the Contract; and

o.  Failing to make timely payments when due.

307.  These acts and omissions were undertaken by the Postal Service at the direction of the Contracting Officer or by his subordinates at the direction of, or with the knowledge, ratification, and/or approval of the Contracting Officer.

308.  NGSC experienced increased costs and schedule delays as a result of the Postal Service's above-described material breaches of contract.

309.  At the time the Parties entered into the Production Contract, the Postal Service knew or should have known that such acts and omissions would increase costs and would delay and disrupt the Contract.

310.  NGSC is entitled to recover damages in the aggregate amount of $178,895,974.73 and an extension to the Contract schedule as a result of the Postal Service's multiple above-described material breaches of contract.

## COUNT III
### Constructive Change – Delay and Disruption Due to Postal Service Acts and Omissions On or Before September 30, 2008

311.  NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

312.  The Postal Service's acts and omissions on or before September 30, 2008 described in this Complaint required NGSC to complete work not required by the terms of the Production Contract, were unreasonable, and caused both delay and disruption to NGSC's performance.

313.  NGSC performed the additional work and, as a result, incurred increased costs and adverse schedule impacts.

314.  Among the acts and omissions occurring on or before September 30, 2008 were the large number of changes (both directed and constructive) made by the Postal Service.  Each of these changes gave rise to individual and cumulative cost and schedule impacts to the Production Contract, as described throughout this Complaint.

315.   The additional work that caused the delay and disruption was required by the Postal Service, at the direction of the Contracting Officer or by his subordinates at the direction of, or with the knowledge, ratification, and/or approval of the Contracting Officer, and the Postal Service represented that it would continue to disapprove NGSC's work unless NGSC implemented the additional work described herein.

316.   The Postal Service was aware of such direction and that the additional work would increase the cost of performance and/or extend the Contract schedule.

317.   The Postal Service's acts and omissions, including the cumulative impact thereof, disrupted NGSC's performance, extended the Contract schedule, and increased NGSC's cost of performance, thereby constructively changing the Contract.

318.   At the time the Parties entered into the Production Contract, the Postal Service knew or should have known that such acts and omissions would increase costs and would delay and disrupt the Contract.

319.   NGSC is entitled to recover damages in the amount of $43,768,663 for delay and disruption, including associated hardware, software, and vendor costs incurred incident thereto that resulted from Postal Service acts and omissions on or before September 30, 2008, and to an extension of the Contract schedule.

**COUNT IV**
**Constructive Change – Delay and Disruption Due to Postal Service Acts and Omissions**
**After September 30, 2008**

320.   NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

321.   The Postal Service's acts and omissions after September 30, 2008 described in this Complaint required NGSC to complete work not required by the terms of the Production

Contract, were unreasonable, and caused both delay and disruption to NGSC's performance.

322. NGSC performed the additional work and, as a result, incurred increased costs and adverse schedule impacts.

323. Among the acts and omissions occurring after September 30, 2008 were the large number of changes (both directed and constructive) made by the Postal Service. Each of these changes gave rise to individual and cumulative cost and schedule impacts to the Production Contract, as described throughout this Complaint.

324. The additional work that caused the delay and disruption was required by the Postal Service, at the direction of the Contracting Officer or by his subordinates at the direction of, or with the knowledge, ratification, and/or approval of the Contracting Officer, and the Postal Service represented that it would continue to disapprove NGSC's work unless NGSC implemented the additional work described herein.

325. The Postal Service was aware of such direction and that the additional work would increase the cost of performance and/or extend the Contract schedule.

326. The Postal Service's acts and omissions, including the cumulative impact thereof, disrupted NGSC's performance, extended the Contract schedule, and increased NGSC's cost of performance, thereby constructively changing the Contract.

327. At the time the Parties entered into the Production Contract, the Postal Service knew or should have known that such acts and omissions would increase costs and would delay and disrupt the Contract.

328. NGSC is entitled to recover damages in the amount of $71,693,402 for delay and disruption, including associated hardware, software, and vendor costs incurred incident

thereto that resulted from Postal Service acts and omissions after September 30, 2008, and to an extension of the Contract schedule.

## COUNT V
### Constructive Change – Discrete Changes

329.   NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

330.   The additional work described in paragraphs 74-286 was work that was not required by the terms of the Contract as awarded.

331.   The additional work nonetheless was required by the Postal Service, at the direction of the Contracting Officer or by his subordinates at the direction of or with the knowledge, ratification, and/or approval of the Contracting Officer.

332.   The Postal Service was aware of such direction and that the additional work would increase the cost of performance and/or extend the Contract schedule.

333.   The Postal Service, by and through the Contracting Officer or by his subordinates at his direction or with the knowledge, ratification, and/or approval of the Contracting Officer, refused to approve NGSC's work, and the Postal Service represented that it would continue to disapprove NGSC's work unless NGSC implemented the constructive changes described herein.

334.   NGSC performed the extra-contractual work described above and, as a result, incurred increased costs and adverse schedule impacts.

335.   At the time the Parties entered into the Production Contract, the Postal Service knew or should have known that forcing NGSC to perform such extra-contractual work would increase costs and would delay and disrupt the Contract.

336.    NGSC is entitled to recover $42,712,265, in the aggregate, for the foregoing constructive

changes, and an extension to the overall Contract schedule.  Alternatively, NGSC is

entitled to recover the amounts, exclusive of associated delay and disruption, applicable

to each discrete constructive change set forth in paragraphs 74-286, and an extension to

the overall Contract schedule.

## COUNT VI
## Impracticability

337.    NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully

set forth herein.

338.    The conflicting and inconsistent contractual requirements relating to the Automation

Compatible Trays and the use of Inventor 10 software rendered performance of those

requirements commercially impracticable.

339.    The Parties did not know when they originally entered into the Contract that the

contractual requirements were conflicting and inconsistent.

340.    The impracticability of those contractual requirements was not the result of any fault on

the part of NGSC, and NGSC did not assume the risk of such impracticability.

341.    The Parties priced and executed the Production Contract based upon the reasonable

assumption that the contractual requirements could be met as prescribed in the Contract

and as performed on prior programs for the Postal Service.

342.    NGSC incurred additional costs as a result of the impracticable contractual requirements

related to the Automation Compatible Trays, which proved not to be commercially

reasonable, and also as a result of the requirement to use Inventor 10 software, which

could not process otherwise acceptable drawings.

343.   NGSC is entitled to recover $1,161,184 and an extension to the Contract schedule as a result of the impracticable contractual requirements related to the Automation Compatible Trays and the Inventor 10 software.

## COUNT VII
## Defective Specifications

344.   NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

345.   Under the Contract, the Postal Service was obligated to provide to NGSC specifications that were adequate, accurate, complete, and suitable for their intended purpose.

346.   The Postal Service breached the implied warranty of specifications, thereby breaching, or in the alternative, constructively changing the Contract by requiring the use of Inventor 10 software that was unsuitable for its intended purpose on the Contract.

347.   NGSC reasonably relied on the statements in the Contract that the Inventor 10 software would be sufficient for the intended use. NGSC did not know that the Inventor 10 software would not operate as originally expected under the Contract.

348.   NGSC incurred additional costs and schedule delays as a result of the Postal Service's defective specifications requiring the use of the Inventor 10 software, and NGSC has not been compensated for the costs associated with these defects.

349.   NGSC is entitled to $973,733 and an extension to the Contract schedule as a result of the Postal Service's defective specifications.

## COUNT VIII
### The Postal Service Claims

350. NGSC hereby incorporates by reference the allegations in paragraphs 1-296, as if fully set forth herein.

351. The claims asserted by the Postal Service in the April 2012 Final Decision are based on: (a) alleged deficiencies in NGSC's performance that were caused by acts or omissions of the Postal Service that adversely affected NGSC's performance and for which NGSC is entitled to additional compensation and schedule relief, as explained in Paragraphs 1-292 above; (b) misinterpretations of Contract terms and conditions; (c) unilateral determinations that the Contract does not authorize the Postal Service to render; (d) asserted damages that were not proximately caused by any act or omission of NGSC; and (e) damages calculations that are speculative.

352. For these and other reasons, the Postal Service's claims are unmeritorious in fact and in law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, NGSC, requests this Honorable Court:

   a. In connection with Count I, declare and adjudge that NGSC is entitled to reformation of the Contract to a cost-plus-fixed-fee structure, pursuant to which NGSC shall be reimbursed for all allowable and reasonable costs allocable to the FSS Production Contract and incurred in connection with its performance from the initiation of performance through completion, plus a reasonable fee thereon, with a corresponding adjustment to the Contract schedule.

b. In the alternative under Count II, declare and adjudge that NGSC is entitled to $178,895,974.73 and an adjustment in the Contract schedule.

c. In the alternative under Count III, declare and adjudge that NGSC is entitled to $43,768,663 and an adjustment in the Contract schedule.

d. In the alternative under Count IV, declare and adjudge that NGSC is entitled to an equitable adjustment in the amount of $71,693,402 and an adjustment in the Contract schedule.

e. In the alternative under Count V, declare and adjudge that NGSC is entitled to $42,712,265, in the aggregate, or in such other specific amounts as are claimed with respect to each discrete constructive change identified in Paragraphs 74-286 and Count V of this Complaint, and an adjustment in the Contract schedule.

f. In the alternative under Count VI, declare and adjudge that NGSC is entitled to $1,161,184 and an adjustment in the Contract schedule.

g. In the alternative under Count VII, declare and adjudge that NGSC is entitled to $973,733 and an adjustment in the Contract schedule.

h. In connection with Count VIII, declare and adjudge that the Postal Service's claims are unmeritorious in fact and in law and that the Postal Service take nothing on those claims.

i. Award interest to Plaintiff as permitted under the Contract and the Contract Disputes Act.

j. Award such other relief as the Court deems just and proper.

Respectfully Submitted,

John W. Chierichella
Attorney for Northrop Grumman Systems Corp.

Sheppard Mullin Richter & Hampton LLP
1300 I Street, NW, 11th Fl., East
Washington, DC 20005-3314
Tel: (202) 218-6878
Fax: (202) 312-9413
Email: jchierichella@sheppardmullin.com

Date: May 4, 2012

Of Counsel:

Anne B. Perry
David S. Gallacher
Sheppard Mullin Richter & Hampton LLP

Valerie Caproni
Linda T. Maramba
Northrop Grumman Systems Corporation