# In the United States Court of Federal Claims

No. 12-286C
(Filed: October 17, 2018)
(Re-Filed: October 31, 2018)[1]

* * * * * * * * * * * * * * * * * * * *

NORTHROP GRUMMAN SYSTEMS
CORPORATION,

                 *Plaintiff*,

v.

THE UNITED STATES,

                 *Defendant*.

* * * * * * * * * * * * * * * * * * * *

Contracts; Contract
Disputes Act, 41 U.S.C.
§§ 7101-7109 (2012);
motions to dismiss;
variance between claim
and complaint; motions
for summary judgment;
contract interpretation.

    *John W. Chierichella*, Washington, DC, with whom were *Anne B. Perry, David S. Gallacher,* and *Christopher M. Loveland*, for plaintiff. *Maureen Del Duca* and *Linda T. Maramba*, of counsel.

    *Cameron Cohick*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Barbara E. Thomas, Jeffrey D. Klingman, Rebecca S. Kruser*, Trial Attorneys, for defendant. *Michael F. Kiely*, United States Postal Service, Law Department, of counsel.

## OPINION

BRUGGINK, *Judge*.

    United States Postal Service ("the Postal Service") entered into a contract with Northrop Grumman Systems Corporation ("Northrop") pursuant to which Northrop would produce and deliver a number of a mail-

---

[1] This opinion was originally issued under seal. The parties agree that no redactions are necessary and thus this opinion is reissued without redactions.

processing machines known as the Flats Sequencing System machine ("FSS machine") for a fixed price of approximately $874 million. The contract was eventually performed, but Northrop has filed suit pursuant to Contract Disputes Act, 41 U.S.C. §§ 7101-7109 (2012) ("CDA"), claiming that the Postal Service breached the contract in a number of ways. The Postal Service has counter-claimed, asserting that Northrop breached its own contractual obligations.

Pending are the parties' motions to dismiss and motions for partial summary judgment. Northrop's motion to dismiss seeks dismissal of the Postal Service's counterclaim counts one and four for lack of subject matter jurisdiction. Plaintiff also moves for summary judgment on the majority of the counts in the Postal Service's counterclaim.

The Postal Service moves to dismiss Northrop's count one for lack of subject matter jurisdiction. Defendant also moves for partial summary judgment on Northrop's count five, summary judgment on count seven, and partial summary judgment on elements of the claims imbedded in counts three through five. The court allowed the parties to submit briefing far in excess of the rule limits. Northrop's motion was fully briefed on June 29, 2018, and defendant's motion was fully briefed on July 20, 2018. We held oral argument on both parties' motions on September 12 and 14, 2018.

BACKGROUND

The Postal Service took its first steps toward ending manual flat mail (bulk mail) sorting on July 10, 2003, when it issued a solicitation seeking proposals to provide research and development for a flat mail sequencing system machine. On October 28, 2003, Northrop and the Postal Service entered into a pre-production contract for Northrop to design a prototype of a machine to sort flat mail. While the pre-production contract was ongoing, the Postal Service issued on May 8, 2006, a non-competitive solicitation to Northrop for the production of 100 FSS machines. On February 23, 2007, well before the research and development contract had been fully performed, Northrop entered into a production contract with the Postal Service to design, deliver, and install the FSS machines.

Shortly after entering the production contract and continuing through the end of both contracts, the parties experienced delays and disagreements regarding the design and installation of the FSS machines. The Postal Service's need for flat mail sorting evolved as well. Nevertheless, despite the difficulties, Northrop installed the last of the FSS machines by August 2011.

From 2007 through 2009, the parties were consistently negotiating the scope of the work required by the contract, which resulted in the generation of the Puts and Takes List[2] by Northrop and a series of equitable adjustments memorialized in modifications to the production contract.

On March 31, 2009, Northrop submitted a request for equitable adjustment, referred to by the parties as the Program REA, claiming approximately $63 million for a large number of alleged constructive changes and delay and disruption claims. On April 28, 2010, the contracting officer denied the vast majority of Northrop's request, but on a number of specific claims he directed Northrop to submit a cost proposal so that the parties could negotiate the equitable adjustment.

Northrop submitted its first certified claim to the Postal Service in July 2010, asserting claims largely related to the Program REA. In May 2011, the contracting officer issued a decision denying the majority of Northrop's claim.

Northrop submitted its second certified claim on August 4, 2011, asserting entitlement to approximately $71 million in damages dating from June 2009 forward. On October 28, 2011, Northrop submitted its third certified claim for approximately $63 million in invoices that it alleged the Postal Service had improperly failed to pay. The contracting officer issued his final decision on April 12, 2012, largely denying the second certified claim, and asserting the Postal Service's claims against Northrop totaling approximately $410 million. Against this he offset the value of the unpaid Northrop invoices plus the amount to which Northrop was entitled based upon one portion of the second certified claim against the counterclaim damages netting a total amount owed the Postal Service of $341 million.

Northrop filed suit in this court on May 4, 2012. The Postal Service filed a counterclaim, which was amended in 2018.

## DISCUSSION

Although both parties have filed motions to dismiss and for partial summary judgment, neither party cross-moved for summary judgment on any of the counts put at issue by their opponent, arguing, in substance, that

---

[2] Northrop created the Puts and Takes List to identify work that it believed was beyond the scope of the contract and submitted this list along with other report deliverables. The Postal Service was aware of the list and the contracting officers appear to have reviewed some version of the list.

disputed issues prevent granting the motions for summary judgment. We begin our discussion with the parties' motions to dismiss.

## I.     Motions to Dismiss

Both parties argue that certain of their opponent's claims are outside this court's subject matter jurisdiction. The party bringing an affirmative claim bears the burden of establishing the court's jurisdiction over it. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936). On a motion to dismiss for lack of subject matter jurisdiction, the court generally "considers the facts alleged in the complaint to be true and correct," but when a party challenges the jurisdictional facts, the court may consider relevant evidence to resolve whether it has jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). If the non-moving party does not establish jurisdiction, the court must dismiss the claim. Rules of the United States Court of Federal Claims 12(h)(3) ("RCFC").

Because Northrop has not established jurisdiction over its count one, we grant the Postal Service's motion to dismiss that count. The Postal Service has established the court's jurisdiction over count one of its counterclaim, so we deny plaintiff's motion to dismiss that count. We grant in part Northrop's motion regarding count four of the counterclaim.

### A.     Defendant's Motion to Dismiss Plaintiff's Count One

In count one, Northrop alleges that the Postal Service affected a cardinal change to the contract and, as a remedy, seeks reformation of the contract so that the parties may determine the amount that the Postal Service should reimburse Northrop for costs incurred. The Postal Service argues that Northrop did not submit a proper claim to the contracting officer because its claim is a monetary one for which Northrop did not seek payment in a sum certain. Thus, the Postal Service contends, the claim falls outside of this court's jurisdiction under the CDA.

The contractor must "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). The contractor "must make a written, non-routine demand to a contracting officer, request a final decision, and seek the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising from or relating to the contract." *Ace Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 266 (2006), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007).

Plaintiff may not circumvent the requirement to state a sum certain in its claim by camouflaging a monetary claim as one seeking only declaratory relief. "If 'the only significant consequence' of the declaratory relief sought 'would be that [the plaintiff] would obtain monetary damages from the federal government,' the claim is in essence a monetary one." *Securiforce Int'l America, LLC v. United States*, 879 F.3d 1354, 1360 (Fed. Cir. 2018) (quoting *Brazos Elec. Power Coop., Inc. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998)). The court determines whether the claim is "in essence a monetary one" by examining the substance of the pleadings. *Id.*

Northrop's first certified claim stated that, taken collectively, the Postal Service's actions constituted a cardinal change. Def.'s Mot. to Dismiss A1566.[3] As a remedy, Northrop asked the contracting officer "to reform the contract to a cost-plus-fixed-fee structure, pursuant to which [Northrop] shall be reimbursed for all allowable and reasonable costs allocable to this Contract . . . plus a reasonable fee thereon." *Id.* at A1567. Northrop concedes that it did not state a sum certain but argues that it was not required to do so because this it is making a claim for adjustment or interpretation of contract terms or other relief arising from or relating to the contract. We disagree.

"A cardinal change is a substantial deviation from the original scope of work that changes the nature of the bargain between the parties." *ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 490 (1996). It is such a fundamental change that the parties cannot redress the change under the contract. Demanding performance thus, places the government in breach of the contract. *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 564 (Ct. Cl. 1978). The default remedy for breach of contract is payment of money. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). Reformation, on the other hand, is an equitable remedy employed in cases of mistake or fraud that requires reforming the terms to reflect the parties' intended bargain. *CIGNA Corp. v. Amara*, 563 U.S. 421, 440-41 (2011).

Consistent with the theory of cardinal change, Northrop claimed that the Postal Service fundamentally altered the nature of the contract by wresting design control from the contractor. Northrop expressly stated in its first certified claim that the government's insistence on a cardinal change renders it in breach and that "[t]he remedy for a cardinal change is breach damages." Def.'s Mot. to Dismiss A1566. Thus, as its own claim concedes, Northrop did not seek the adjustment or interpretation of contract terms.

---

[3] Citations to the parties' appendices are preceded by an "A" as shown.

The cardinal change claim likewise was not a claim for other relief arising from or relating to the contract, because Northrop's claim is not for any relief other than the traditional relief for breach of contract, namely, money. Although Northrop argues that the Postal Service would not be paying Northrop money damages if the contract were reformed but instead would be reimbursing Northrop for costs incurred, that is a distinction without a difference. Despite Northrop's creativity in stating this claim, the theory of cardinal change calls for a breach remedy–money damages–and Northrop is in fact seeking a payment of money from the Postal Service. Indeed, Northrop has hired an expert who has calculated the amount he believes the Postal Service owes plaintiff: approximately $252 million. *Id.* at A1766.

Because Northrop's claim is clearly a monetary one, Northrop had the obligation to include in its claim submitted to the contracting officer its best effort to state a sum certain, albeit one that could have been modified later to fit the proof. Because Northrop did not submit a valid claim to the contracting officer, count one is outside of this court's CDA jurisdiction. *See* 28 U.S.C § 1491(b) (citing 41 U.S.C. § 7104(b)(1)); 41 U.S.C. § 7103(a)(1). We therefore grant the Postal Service's motion to dismiss.

B.     Plaintiff's Motion to Dismiss Defendant's Count One

The Postal Service's counterclaim count one alleges that it suffered $180,782,291 in lost savings due to Northrop's failure to install the FSS machines by the contractually required dates. Northrop argues that the court lacks jurisdiction over count one because it is not within the scope of the contracting officer's statement of the Postal Service's claim.

It is a fundamental principle of government contract law that contract claims, whether asserted by the contractor or the government, must be the subject of a contracting officer's final decision. 41 U.S.C. § 7103(a)(1)-(3) (2012); *Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014). The requirement is prompted by the hope that the claim can be resolved at the contracting officer level, and that goal is hindered if the claim a party presents in court is substantially different from the claim presented to or by the contracting officer. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1331 (Fed. Cir. 2010). To determine whether the claim is the same as that in the contracting officer's final decision, the court considers whether the claims "(1) are based on the same underlying theory; (2) seek the same relief; and (3) arise from the same operative facts." *Kansas City Power & Light Co. v. United States*, 131 Fed. Cl. 161, 165 (2017) (citing *Scott Timber*

*Co. v. United States*, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003)). Defendant's counterclaim easily satisfies this test.

The "essential facts that give rise to a cause of action" are the operative facts. *Kiewit Constr. Co. v. United States*, 56 Fed. Cl. 414, 420 (2003). "[I]f the claim presented to the contracting officer requires examination of a different or unrelated set of operative facts, then the claims are separate." *Affiliated Constr. Grp., Inc. v. United States*, 115 Fed. Cl. 607, 612 (2014) (internal citations and quotation marks omitted). "When the claims differ in the underlying factual basis for relief, and when the claims require different kinds of proof, they are different claims for purposes of the CDA." *Id.* (citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 909 (Fed. Cir. 1990); *AAB Joint Venture v. United States*, 75 Fed. Cl. 414, 422-23 (2007)).

The contracting officer stated a claim for lost savings due to Northrop's failure to install the FSS machines by the contractually required dates. The Postal Service's count one alleges that the Postal Service lost savings due to Northrop's failure to install the FSS machines by the contractually required dates. The Postal Service did not change its legal theory or relief it seeks.

The parties dispute, however, whether the Postal Service's count one uses the same essential facts that gave rise to the claim stated by the contracting officer. The final decision states that the contract schedule was the schedule adopted in Modification ("Mod.") 2 to the contract. Pl.'s Mot. to Dismiss A150. Using the installation dates set forth in the October 2007 Mod. 2 schedule, the contracting officer determined the time the Postal Service was unable to use the machines by comparing the Mod. 2 installation dates to the actual installation dates. The Postal Service's counterclaim uses the same language: Mod. 2 is the applicable schedule and the government alleges that Northrop failed meet Mod. 2 and the Mod. 17 schedule. Def.'s Am. Countercl. ¶¶ 37, 42, 45-49.

The Postal Service now uses different anticipated installation dates to calculate lost savings, however. The Postal Service's experts used an installation schedule referred to as "Rev J," which followed the Mod. 2 schedule, decreasing the Postal Service's claim to approximately $180 million. Northrop argues that the same evidence will not be used to show that Northrop failed to meet the Rev J installation dates instead of the Mod. 2 installation dates. The question is whether Rev J was a fundamentally different schedule than the one relied on in the contracting officer's decision. We believe it was not.

Statement of Work ("SOW") C governs deployment. Section 6.2, states, "The Supplier shall develop a deployment schedule subject to USPS approval within 4 weeks after contract award from the deployment data." *Id.* at A159. SOW B deliverables spreadsheet lists this deliverable as C-19. In Award Data Sheet, paragraph 2, the parties agreed to incorporate into the contract "a mutually agreeable FSS Production deployment schedule in accordance with the statement of work" within eight weeks after Northrop submitted C-19. Def.'s Resp. Mot. to Dismiss A578. Section 6.3 states that the contracting officer would "provide individual changes to the deployment schedule" Northrop. Def.'s Resp. A160. Northrop would then "incorporate these changes into a revised/updated deployment schedule monthly . . . ." *Id.* SOW B lists the SOW C 6.3 deliverable as C-21.

Northrop submitted the C-19 schedule on March 16, 2007 and subsequently submitted two revisions. Def.'s Resp. A591, A598. The parties executed Mod. 2 on October 2, 2007, incorporating "Section - C-19 Deployment Schedule, 2007-06-26 Rev 0." Pl.'s Mot. to Dismiss A108-09. With the C-19 schedule in place, the parties continued to adjust their scheduling expectations through the C-21 deliverable. On October 19, 2007, the Postal Service sent a response letter to a draft C-21 deliverable Northrop had submitted, stating, "[F]ollowing the approval of the C-19 Deployment Schedule, now a part of the contract via Mod 002, 1) the deployment schedule shall here forward be referred to as C-21 and 2) can only be changed by NGSC by receiving authorized direction to do so from the USPS." Def.'s Resp. A706.

Northrop submitted an "Updated Deployment Schedule," referring to "SOW Schedule B, Item C-21 paragraph 6.3" on November 5, 2007. *Id.* at A708. Northrop submitted C-21 Rev J on December 5, 2008. *Id.* at A838. The parties agreed on updated deployment schedules through May 5, 2011, Rev M, totaling more than ten deployment schedules.

As the Postal Service sees it, there is essentially only one schedule operative at any given time and the facts essential to its claim are that Northrop failed to meet whatever were the required delivery dates. It views the C-19 schedule incorporated through Mod. 2 and the updated deployment schedules that followed as serving the same purpose: reaching machine installation. Rev J delivery dates are merely the most accurate dates available to calculate lost savings, according to the Postal Service. Regardless of which dates are the controlling dates for installation, the proof is the same: a comparison of required versus actual delivery dates.

It is unnecessary for the court to determine at this point the precise operative dates for installation for any given machine. That determination is primarily one of law and is premature at the present. It is sufficient to observe that the contracting officer's decision and count one are based on the same underlying theory–failure to perform on time; they seek the same relief–damages for loss of the use of the machines; and they rely on the same comparison between the controlling schedule and the dates the machines were installed. Therefore, we deny plaintiff's motion to dismiss count one.

C.    Plaintiff's Motion to Dismiss Defendant's Count Four

The Postal Service alleges in counterclaim count four that it suffered $2,323,635 in costs due to Northrop's failure to supply the contractually required number of spare parts in spare parts kits. Northrop argues that the operative facts underlying the Postal Service's claim here are substantially different from those reflected in the claim asserted by the contracting officer.

The contracting officer issued a final decision on April 12, 2012, claiming that Northrop owed the Postal Service $3.9 million for failing to provide sufficient parts. He attached to the decision a series of spreadsheets itemizing the spare parts allegedly omitted.

The legal theory and type of relief requested are identical. Both amount to an assertion that the promised spare parts were not furnished, and the relief consists of the asserted replacement cost of the missing parts, although count four decreases the amount allegedly owed to $2.3 million. In addition, both the final decision and count four trace the parties' disagreement to differences in how SOW H section 2.3 and 2.3.5 should be interpreted. We address the contract interpretation question in the summary judgment section on count four. For purposes of the motion to dismiss, it suffices to state that the contract provided the supply and re-supply levels of parts and a process by which the Postal Service would list for Northrop the type and depth of specific parts. Both the contracting officer's final decision and the claim here rely on lists of spare parts that Northrop allegedly was required to but failed to supply.

There the similarity ends, however. Count four relies on a virtually new list of unique parts upon which the contracting officer's final decision was based. The Postal Service's proof is a substantially different data set that includes different parts, quantities, and prices than those listed in the contracting officer's decision.

The differences involve the majority of the parts on each list, leaving minimum overlap between the final decision and count four. If we were confronted with a final decision claiming that Northrop failed to supply a single spare part, and the counterclaim asserted the absence of a completely different part, we could readily conclude that the claims were based on materially different facts. If, on the other hand, the final decision asserted the failure to produce 100 assorted spare parts, and the counterclaim reduced that list but reasserted the balance, we could conclude readily that the claim was *not* materially different. The counterclaim also does not, for example, merely adjust the particular quantities of the same parts nor does it tweak the value of the missing parts. Here, we are confronted with something unlike any of these examples. The contract required Northrop to provide certain parts at a particular supply and re-supply level. The counterclaim reasserts the final decision to the extent that many of the same parts are asserted to be missing, but also adds dozens of parts that do not appear on the original lists. The counterclaim also substantially alters the quantity of parts.

This is more than a mere correction of specifics or an adjustment to the quantum of damages. The Postal Service would have to rely on an entirely different set of evidence to prove its claim. We view count four as too far a departure from the final decision. Accordingly, we grant Northrop's motion to dismiss count four in part. The government may pursue count four but only to the extent the same parts in the counterclaim appear in the final decision, irrespective of quantity or price.

II.     Motions for Summary Judgment

The court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Material facts are those "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Even if the facts in dispute are material, the dispute must also be genuine, meaning "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Id.* at 248.

A.     Plaintiff's Partial Motion for Summary Judgment

Northrop moves for partial summary judgment on the Postal Service's counterclaim, except for count six on repair specifications.

### 1. Count One: Lost Savings

The Postal Service's count one claims lost savings due to Northrop's failure to install the FSS machines by the contractually required dates. Northrop argues, in the alternative to its motion to dismiss, that it is entitled to summary judgment because (1) the Postal Service did not suffer lost savings; (2) 398 days of delay constituted excusable delay; (3) the Postal Service's re-planning rendered the Mod. 2 Schedule irrelevant; and (4) the Rev J planning schedule cannot form the basis for any delay claim.

First, Northrop argues that the Postal Service's actual accounting data on actual hours worked and routes serviced by carriers demonstrates that the Postal Service did not suffer lost savings. Both parties' experts used the Postal Service's data, while applying different factors each believes relevant, and reached divergent conclusions on whether there were lost savings. The Postal Service argues that the questions of what data is superior and what the data proves are fact questions. We agree. We are confronted with competing damage and delay calculations which require presentation at trial.

Second, Northrop argues that its performance was excusably delayed between June 5, 2009, and July 8, 2010, when the Postal Service made performance impossible due to changes to the Carrier Automated Street Tray Rack ("CASTR"). It argues that CASTR was on the critical path. The Postal Service responds with its own evidence to argue that CASTR was not on the critical path and that performance was possible during the cited period. There is a genuine fact dispute regarding the source of the delay and whether the delayed diverted Northrop from continuing progress on the critical path.

Northrop's final arguments relate to the controlling schedule for FSS machine installations. Northrop argues that the Postal Service's "re-planning effort rendered the delivery schedule then in place irrelevant"–referring to the Mod. 2 schedule–and that the Postal Service "cannot rely on an irrelevant delivery schedule to support its delay claim." *Id.* at 4. Northrop contends that the re-planning effort led to the number and location of sites changing such that all schedules, incorporated into the contract or planning schedules, prior to the Mod. 17 schedule were rendered irrelevant. Similar to excusable delay, the extent and consequences of the re-planning effort are bound up in fact disputes concerning what happened in the period between Mods. 2 and 17.

Relatedly, there are fundamental factual disputes concerning the evolution of the performance schedule and whether Northrop adhered to it. There are disputes concerning which deployment schedule was operative, whether the re-planning effort rendered the schedule irrelevant, the causes of

delay, and whether the events in question were on the critical path. We thus deny Northrop's motion for summary judgment on count one.

### 2. Count Two: Deficient Handbook

The Postal Service alleges in count two that Northrop submitted the FSS machine handbook to the Postal Service with defects, even though the contract required a defect free handbook. Because Northrop failed to correct those defects, the Postal Service alleges that it spent $1,086,978 in costs to correct the handbook.

Northrop argues that the Postal Service constructively accepted the handbook when it failed to complete a 100% review and identify defects within a 90-day review period. Northrop also argues that, even if the Postal Service properly rejected the handbook, Northrop is liable only for the costs to fix the defects above the allowable number of defects. Finally, Northrop argues that the Postal Service cannot identify which defects were caused by Northrop. The government responds that Northrop's contract interpretation is flawed and that factual disputes preclude summary judgment.

SOW L regarding Technical Publication Maintenance Handbook governs the submission of the handbook. SOW L 8.6.10 provides that the "MS Handbook(s) shall be delivered in an incremental fashion as described below." Pl.'s Mot. Summ. J. A1316. The section sets out an iterative process for draft volumes, a preliminary handbook, and then subsequent handbook releases. Section 8.6.10.5 states, "The Supplier shall deliver maintenance documentation updates according to the following schedule: . . . 4. TL1, CH2 (final) - 1 month prior to last deployed unit." *Id.* at A1317. The parties agree that what is at issue is the release of the final handbook.

Northrop correctly states that section 8.6.4 provides, "The following deliverables will have a 90 day calendar review time: Entire MS Handbooks." *Id.* at A1314. The undisputed series of exchanges on this handbook deliverable were as follows: Northrop submitted the handbook on June 15, 2001. The Postal Service rejected Northrop's submission, on September 28, 2011. The Postal Service sent Northrop more comments on the first submission on November 1, 2011. Northrop submitted a revised version on January 26, 2012. The Postal Service rejected the updated submission on February 29, 2012. Based on the first two exchanges, the Postal Service apparently did not review the submission of the final handbook within ninety days. The Postal Service's delayed review, however, is not the end of the inquiry.

12

We next consider Northrop's duty regarding any defects in its submission. SOW L 8.2, Quality Assurance, states, "Quality will be measured by ensuring adherence to the requirements and that the content of all final MS Handbook deliverables match the fielded physical equipment. In order to ensure defect free deliverables, the Supplier shall perform" the requirements listed in the balance of section 8.2. *Id.* at A1308.

Section 8.6.6 states, more specifically, "The Supplier shall warrant all deliverables required in this section as complete, accurate, and free of defects according to the requirement of this SOW at the time they are shipped, mailed, or otherwise delivered to USPS." *Id.* at A1314. Thus, independent of any Postal Service review, Northrop had a duty to warrant that its deliverables were free of defects. Sections 8.6.5 and 8.6.7 also provide that Northrop bore the risk of deliverables submitted with defects.

Section 8.6.5 provides deliverable acceptance criteria. It states that the Postal Service's approval process is not limited to the initial review, but that the "approval process includes the review, evaluation, verification, and validation of all MS Handbook deliverable content." *Id.* The section concludes, "Notification of deliverable acceptance . . . does not relieve the Supplier of any obligation to correct errors, deficiencies, or omissions discovered in the use of the deliverable, for the life of the contract." *Id.*

Section 8.6.7 provides that, if the Postal Service were to reject a deliverable, it would identify the criteria on which Northrop was deficient. The Postal Service would provide "[c]omments detailing deficiency type and location," but "[t]hese comments will be of a specific or global nature, they will not necessarily be inclusive of all deliverable deficiencies, and will identify general deficiency issue and trends." *Id.* The section obligates Northrop to "review the delivery, [and] search for and correct any instances of the deficiency." *Id.* These sections indicate that the approval process involved more than the 90-day review and, whether accepted or rejected, Northrop retained the responsibility to correct defects. The Postal Service thus did not constructively accept the handbook after ninety days elapsed.

Northrop also argues that "defect free" actually means, "defect free, except for those defects below the allowable level." Northrop draws this interpretation from section 8.2.3. The Postal Service "will review all deliverables and identify any defects found, classified by the following categories below": "Major defects (incorrect, incomplete, or missing)" and "Minor defects." *Id.* at A1309. However, the Postal Service "may identify additional categories of defects applicable to the specific products being

delivered." *Id.* This section does not state that either kind of defect is allowable or set an allowable level of defects.

This classification system is referenced in section 8.2.4, Deliverable Development Audit, and section 8.2.5, Validation or Verification Audits. Section 8.2.4 provides that "[t]he audit of deliverables will be considered deficient based on the following criteria: 1. Average of one major defect (per 50 pages) 2. Average of twelve minor defects (per 50 pages)." *Id.* at A1310. If the Postal Service deemed the deliverable deficient, the section continued to provide a process for Northrop to correct the deficiency.

Section 8.2.5 likewise states, "At USPS discretion, a validation or verification may be suspended, and/or rejected based on the following criteria: 1. Average of one major defect (per 50 pages) 2. Average of twelve minor defects (per 50 pages)." *Id.* at A1311. The section also provides Northrop's obligation to submit a process improvement plan if validation or verification are suspended or rejected. Thus, although defects were to be classified as major or minor for all parts of the approval process, the only place that the concept of a permissible number of defects is referenced is in deciding whether a deliverable is sufficient to pass an audit, verification, or validation. The criteria in sections 8.2.4 and 8.2.5 must be read together with Northrop's duty to warrant a defect free handbook. The contract thus does not excuse Northrop from correcting defects below the above-stated levels.

Northrop contends that the Postal Service was required to review 100% of the handbook for defects within the review period. Section 8.3 covers the on-equipment validation. Section 8.3.1 states that part of the validation process was a Northrop-submitted validation plan, which "must allow time to complete a 100% validation, correct defects found during the validation, and revalidate . . . ." *Id.* at A1311. Section 8.3.3 repeats the same requirement. These appear to be the only references to a one hundred percent validation requirement and it is imbedded in a provision that time must be allowed for both parties to complete a full validation, rather than a provision that shifts the burden to the Postal Service to identify every defect or risk being stuck with the cost of fixing them. None of Northrop's arguments relating to constructive acceptance and an allowable level of defects are consistent with SOW H 8.0.

Finally, Northrop argues that summary judgment is appropriate because the Postal Service cannot prove that Northrop caused the defects. Northrop argues that both parties made changes to the handbook after submission and that the Postal Service cannot differentiate between the two sets of changes. The Postal Service responds that the contracting officer was

able to identify Northrop-submitted defects and that the editing process allowed it to differentiate between the two sets of changes. The materials submitted are sufficient to demonstrate that there is a genuine dispute regarding the existence and cause of any defects. We deny Northrop's motion on count two.

### 3. Count Three: Deficient Relocation Manual

The Postal Service alleges in count three that the contract obligated Northrop to submit a relocation manual free of deficiencies and that it failed to do so. The Postal Service alleges that it sustained $533,147.25 in damages to correct the deficient manual. Northrop argues that the Postal Service constructively accepted the manual because the Postal Service did not review the manual within the review period. Even if the Postal Service properly rejected its manual, Northrop contends, the replacement manual for which the Postal Service contracted with Siemens constitutes unreasonable cover.

SOW F 9.0 addresses installation and relocation manuals. Section 9.2 on the relocation manual states:

> The Supplier shall develop and deliver a relocation manual containing detailed step-by-step procedures required to disassemble, pack, ship, unpack, reassemble, integrate, align, adjust, troubleshoot, and test a complete FSS system. The relocation manual must be of sufficient detail and in sequential order to complete the relocation. No steps shall be omitted or assumed. . . .

> The USPS will validate the completeness and adequacy of the relocation manual 12 months after the acceptance of the first production FSS. All corrections, additions, or clarifications identified by the USPS during this validation must be incorporated into an updated relocation manual and submitted to the USPS 8 weeks after the relocation manual discrepancies are identified to the supplier by the USPS. The USPS will review the updated manual and provide acceptance or rejection within four weeks of receipt. . . .

*Id.* at A1621-22.

SOW B Rev F, incorporated by Mod. 23, is a spreadsheet of deliverables, specifying, where applicable, a deliverable review period. *Id.* at A1319. It provides that the manual's review period is four weeks and that

Northrop "shall update per validation comments and resubmit 8 weeks later USPS will review and provide acceptance or rejection within 4 weeks of receipt." *Id.* at A1323. The timelines in these two sections are consistent: one year after the acceptance of the first production FSS machine, the Postal Service would validate the manual; eight weeks after the Postal Service identifies revisions to Northrop, Northrop must submit an updated manual; and finally, the Postal Service had to accept or reject the updated manual within four weeks.

The Postal Service accepted the first production FSS machine on July 23, 2010. *Id.* at A1503. Applying section 9.2 means validation of the manual would begin July 23, 2011. Northrop submitted a draft manual on April 8, 2011, approximately eight months later. *Id.* at A1624. Northrop then submitted another version, which it identified as its final submission, on September 2, 2011. *Id.* at A1628. The Postal Service provided its response, identifying defects, on November 22, 2011. At that point, Northrop had eight weeks to respond. Northrop submitted its revision on February 10, 2012, which with holidays appears to be within the eight week window. The Postal Service identified seven critical and six major deficiencies in the manual and rejected its second submission on March 1, 2012, less than three weeks later.

The party's dispute, however, which of Northrop's submissions triggered the eight week review period. Northrop argues that the Postal Service should have responded to the April 2011 submission within eight weeks, citing to internal Postal Service communications suggesting that the submission had been accepted by the agency's failure to respond. *Id.* at A1641. The Postal Service cites to August 2011 emails stating that the relocation manual was incomplete. Def.'s Resp. Mot. Summ. J. A1507-08. Thus, there is at a minimum a reasonable inference that the Postal Service followed the timeline provided in section 9.2, precluding summary judgment.

As to unreasonable cover, Northrop argues that the Postal Service's replacement manual materially differed from the contract requirements. For example, the new statement of work consisted of twenty pages, whereas SOW F dedicated three paragraphs to the relocation manual. The contract for a replacement manual was a cost-reimbursable contract rather than firm fixed price, which, Northrop argues, gave the new supplier less concern for money spent on developing the replacement manual. The new supplier also had the benefit of recording the process of relocation. The Postal Service claims that each of the differences was reasonable based on the detail necessary to successfully relocate a machine. The reasonableness of the cover is fraught with fact questions. We deny Northrop's motion on count three.

4. Count Four: Deficient Spare Parts

The Postal Service alleges in count four that Northrop had a duty to provide a certain level of spare parts for the FSS machines and that it failed to provide the required amount of spare parts in two respects. First, during the period prior to February 10, 2012 ("the deployment period"), Northrop failed to provide spare parts to the level required by the contract, resulting in a spare parts cost to the Postal Service of $1,179,636. Second, measuring from February 10, 2012 ("the post-deployment period"), Northrop failed to provide sufficient parts to bring the Depot Spare Parts Kit ("the Depot")[4] up to the required six-month re-supply level, resulting in a spare parts cost to the Postal Service of $1,143,999. Northrop moves for partial summary judgment on the Postal Service's claim that Northrop failed, in the post-deployment period, to provide a six-month re-supply level in the Depot.

Northrop raises a question of contract interpretation: what was Northrop's obligation to replenish the Depot following the acceptance of the final FSS machine? Northrop argues that, in the post-deployment period, Northrop was required "to replenish the [Depot] with parts that, when combined with those parts already on hand in the various Site Spare Parts Kits [], would sustain the machines at the sites for a period of six months." Pl.'s Reply 35. The Postal Service responds that the contract requires that the Site Spare Parts Kits must contain sufficient parts for two systems for six months. The Postal Service argues that, in addition to the Site Spare Parts Kits, Northrop must stock the Depot with parts sufficient to ensure uninterrupted re-supply of all sites for at least six months and replenish that Depot to maintain that re-supply level through February 10, 2012.

To understand Northrop's duty relating to spare parts in the Depot in the post-deployment period, we turn to SOW H.[5]  SOW H 1.0 provides Northrop's general obligation to "provide all parts necessary to maintain the integrity and quality performance of all equipment . . . beginning with the U.S. Postal Service acceptance of the first equipment." Pl.'s Mot. Summ. J. A1776. SOW H 1.5 explains that Northrop and the Postal Service "shall meet in provisioning conferences and review meetings to exchange information

---

[4] The contract refers to "Depot Spare Parts Kits," plural, in the SOW H Section 2.3 heading and then refers to a "Depot Spare Parts Kit," singular, in the text of section 2.3. The parties consistently refer to this kit as the Depot or the DSPK, a single depot for spare parts for the FSS machines. We thus adopt their terminology and refer to this kit as the Depot.

[5] SOW H was incorporated into the Contract via Mod. 14 as SOW H Rev A, dated April 28, 2010. Pl.'s Mot. Summ. J. A1767-70.

where the US Postal Service will determine the range, depth and location of the spare parts, and the final composition of the spare parts kits." *Id.* at A1776.

Northrop was required to provide three types of spare parts kits: Supply Items Kit, Site Spare Parts Kits, and the Depot. We are concerned with the relationship between the Site Spare Parts Kits and the Depot. Section 2.2 provides that Northrop "shall provide a full and complete Site Spare Parts Kit concurrent with the delivery of the first system at each FSS deployment site." *Id.* at A1777. A Site Spare Parts Kit "shall contain assemblies, sub-assemblies, and components necessary to support the equipment at the Field Replaceable Unit level (FRU) at each USPS site." *Id.* If the site received more than two FSS machines, Northrop was required to provide supplemental Site Spare Parts Kits such that there was one kit for every two machines. *Id.* Section 2.2.3 states that a Site Spare Parts Kit "shall contain, at a minimum, a supply of items, to ensure continuous, uninterrupted equipment operation for two systems, eighteen (18) hours a day, seven (7) days per week, for a period of six months." *Id.*

In addition to the Site Spare Parts Kits, section 2.3 requires Northrop to provide "a full and complete Depot Spare Parts Kit [] to the USPS. The Supplier shall deliver the [Depot] concurrent with delivery of the second production field unit." *Id.* at A1778. "The [Depot] shall contain assemblies, sub-assemblies, and components necessary to support the re-supply of the stockrooms at each USPS site and shall include insurance and other items not provided as part of the [Site Spare Parts Kit]." *Id.* The Depot, according to section 2.3.1, "shall contain spare parts and supplies necessary to ensure uninterrupted re-supply of all sites for a minimum period of six (6) months, based on a system population of 100 FSS." *Id.*

Section 2.3.5 provides that Northrop "shall replenish the [Depot] from the time the [Depot] is delivered to the USPS until one year after the final acceptance of the last deployed FSS system." *Id.* at A1779. Mod. 17 changed the end of the Depot replenishment period to 30 weeks after the planned acceptance of the last machine (February 10, 2012). *Id.* at A587. The parties do not dispute that whatever the content of the Depot, that content had to be sufficient to ensure uninterrupted re-supply of all sites for at least six months.

The dispute centers on what parts were required to fulfill the six-month re-supply level standard. Northrop contends that the contract did not require it to replenish the Depot such that the Site Spare Parts Kits and the Depot contained duplicates, i.e., that the site kits contained sufficient parts for an uninterrupted six months of operation and that the Depot contained the

same parts sufficient for six months of re-supply. Section 2.3 requires precisely that, however: "assemblies, sub-assemblies, and components necessary to support the re-supply of the stockrooms at each USPS site . . . ." *Id.* at A1778. These are the same categories listed in the Site Spare Parts Kits provision: "assemblies, sub-assemblies, and components necessary to support the equipment at the Field Replaceable Unit level (FRU) at each USPS site." *Id.* at A1777. The Depot also was required to go beyond those categories to provide "insurance and other parts not provided as a part of the [Site Spare Parts Kit]." *Id.* at A1778.

Northrop contends that this duplication of parts is an irrational result, but it is no more rational to suggest that the Site Spare Parts Kits contained six months of spare parts and that the Depot would hold only parts not in the site kits. The Depot was intended to re-supply, which in plain language means to supply again, or to replace a supply that had previously existed. Indeed the entire spare parts kits section indicates that the goal was to avoid gaps in the supply of spare parts. Because the contract unambiguously anticipated such duplication, we agree with the Postal Service that it is not claiming more than the contract obligated Northrop to provide.

Northrop also argues that, even if it did not supply the contractually required amount of spare parts, the Postal Service "waived its right to claim entitlement for spares demanded outside and after the conclusion of [the Post-Deployment Parts Provisioning Conference]." Pl.'s Mot. Summ. J. 60. Northrop's argument is that (1) the provisioning conference was the sole contractual method for determining what parts would fill the Depot; (2) the Postal Service ended the conference prior to finalizing what parts would be included; and thus, (3) the Postal Service waived a claim for deficient spares for any parts not covered during the conference. The Postal Service responds that halting the Post-Deployment Parts Provisioning Conference in favor of a more efficient process did not constitute a Postal Service waiver of its entitlement to the contractually required amount of spare parts.

The contract defines waiver as "[a] U.S. Postal Service approved relinquishment of an accepted policy, procedure, or requirement." Def.'s Resp. A101 (Section A1 2.0). The Federal Circuit consistently has stated that "[a] waiver is 'an intentional relinquishment or abandonment of a known right.'" *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1372 (Fed. Cir. 2016) (quoting *Massie v. United States*, 166 F.3d 1184, 1190 n.** (Fed. Cir. 1999) (internal quotation marks and citation omitted)). A waiver may be express or implied, but the statement or conduct constituting the waiver must unequivocally demonstrate that the party relinquished its contractual right. *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 686-87 (1994); *see also*

*Sandler v. AII Acquisition Corp.*, 954 F.2d 382, 385 (6th Cir. 1992). The waiver doctrine is "designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." 13 Williston on Contracts § 39:15 (4th ed.).

SOW H 1.5 provided that the Postal Service would determine the range, depth, and location of parts and the final composition of the spare parts kits through provisioning conferences and review meetings. Section 5.0 sets out the details, stating that Northrop "shall host a spares review meeting and, at a minimum, two (2) provisioning conferences." Pl.'s Mot. Summ. J. A1790. The Postal Service would "utilize the three meetings/conferences . . . to define the range and depth of spares kits, but may utilize additional parts provisioning conferences to correct range and depth issues identified through actual parts demand and consumption. At the meeting and conferences, the USPS shall direct the Supplier to modify" the kits and the Depot. *Id.*

The "three meetings/conferences" are the 5.2 Spares Review Meeting, 5.3 Pre-Deployment Parts Provisioning Conference, and 5.4 Post-Deployment Parts Provisioning Conference. The pre-deployment discussions would center on adding, deleting, and modifying the spare parts list.

At issue here is the Post-Deployment Parts Provisioning Conference. Section 5.4 states that Northrop "shall host a post-deployment provisioning conference." *Id.* at A1792. The delivery schedule set the date of the conference, but it could be held "no later than 60 days prior to scheduled delivery of base buy final production equipment and after acceptance of the production baseline TDP and production baseline provisioning documentation by the USPS. The intent of this conference is to finalize provisioning requirements . . . ." *Id.*

Section 5.4.1 continues that Northrop and the Postal Service shall "jointly review" the "[c]onfiguration of all spare parts kits . . . during the post-deployment parts provisioning conference." *Id.* The Postal Service "will direct the addition of items, delete items, and/or modify quantities of items during the post-deployment parts provision conference." *Id.*

Northrop contends that the waiver occurred when the Postal Service halted the review of the spare parts kits and failed to finalize additions, deletions, and modifications during the Post-Deployment Parts Provisioning

Conference. Northrop cites to meeting notes that indicate that the contracting officer attended the conference. The notes state that,

> The team reviewed the NGSC sparing recommendations for all items down to a USPS demand quantity (six month forecast) of 14 (approximately 156 line items). . . . At this point, USPS determined that it will be more efficient to stop the line by line review of the data at the group level and conclude the meeting. USPS assumed the action to complete their own internal review of the remaining items and submit the resulting recommendations by Jul 1st 2011 . . . .

*Id.* at A1813. Northrop also cites to deposition testimony in which a Postal Service representative stated, "There were several spares meetings. . . . But provisioning conference as specified in the SOW did not occur." *Id.* at A1818.

The Postal Service responds that the section 5.4 provisioning conference did not occur because Northrop failed to provide the production baseline TDP and production baseline provisioning documentation to the Postal Service prior to scheduling the post-deployment conference. The Postal Service highlights that the conference notes do not reference those documents. The Postal Service also cites a declaration from a Postal Service Maintenance Specialist, Thomas J. Fuchs, in which he states, "As of May 30, 2011, the FSS was not stable enough to finalize provisioning requirements, validate spare parts kits configuration, or validate level of repair . . . ." Def.'s Resp. A3792-93.

Because the Postal Service concluded the conference and initiated a separate process for finalizing the spare parts list, we can agree with Northrop that this constitutes a relinquishment of the parts provisioning conference process, particularly because the contracting officer was present. But Northrop further argues that we should extend that relinquishment to the underlying requirement that Northrop must provide a particular level or amount of parts in the Depot during the post-deployment period. We disagree. Even if the Postal Service waived the process to finalize the list during the conference, this waiver does not extend as far as Northrop argues.

The notes that Northrop cites are susceptible to the reading that the parties agreed to extend the process of finalizing a spare parts list because the in-person process was unwieldy and the parties were not fully prepared. The notes state, "It was agreed that NGSC will review the USPS inputs . . . . At the point where all recommendations are recorded on each part's portion

21

of the spreadsheet, the completed document will be distributed, and the Provisioning conference will be complete." Pl.'s Mot. Summ. J. A1813-14. The Postal Service did not trap Northrop into the expectation that the Postal Service would not finalize the list of parts or request replenishment. Instead, the Postal Service followed this meeting with correspondence regarding the spare parts list. *Id.* at A1830, A1833-1965.

Likewise, the Postal Service deposition testimony, in addition to Mr. Fuchs declaration, does not state unequivocally that the Postal Service abandoned the contract procedure, but rather that the Postal Service did not believe the provisioning conference was convened properly. We cannot agree with Northrop that the facts presented demonstrate that the Postal Service waived its claim for a failure to replenish the Depot to the required level by waiving the process set out in SOW H 5.4 and 5.4.1.

In sum, the contract provides for the existence of duplicates between the Site Spare Parts Kits and the Depot. The Postal Service did not waive its right to a claim for any parts ultimately required but missing from the spare parts list. The fact question remains whether Northrop provided the parts that the Postal Service alleges it failed to provide. Thus, we deny Northrop's partial motion for summary judgment on count four.

### 5. Count Five: Costs Incurred During the FSS Machine Retest

In count five, the Postal Service alleges that it incurred $1,589,747.41 in costs due to Northrop's FSS machine failing to pass the first article test and field acceptance tests, leading to retests. Northrop argues that the Postal Service incurred no unanticipated cost because, even with the retesting, the testing period lasted less than the eight weeks anticipated by the contract. Northrop also maintains that, even if it must reimburse the Postal Service for costs associated with the retesting, the contract only requires payment for Postal Service personnel, and that the payment should be at the actual rate rather than the contractual rate.

The relevant contract sections are SOW A 8.1.4 and 8.5. Section 8.1.4 provides that the Postal Service "will formally perform an operational test of the system in a live mail environment, with a per day duration of up to 16 hours of operation. The Active test is an eight week formal acceptance test . . . ." *Id.* at A2055. Section 8.5 states, "[I]f the FSS fails to pass all of the requirements in the contract or the Supplier elects to stop the acceptance test prior to acceptance, the Supplier shall reimburse the USPS for the cost associated with the retest. This reimbursement is over and above other remedies specified in the contract terms and conditions." *Id.* at A2056. The

section provides that Northrop "will be charged at a rate of $60 per work hour for . . . [t]he total time spent by the USPS Test Director and other test personnel . . . ." *Id.*

Although Northrop may be correct that the field first article test plus the retests together spanned less than eight weeks, the trigger for Northrop reimbursing the Postal Service for the costs associated with retest is not the passage of eight weeks. Instead, reimbursement is required if "the FSS fails to pass all of the requirements in the contract or the Supplier elects to stop the acceptance test  . . ." *Id.* at A2055. As we indicated at oral argument, whether the FSS machine met the contract requirements involves disputed facts.

Northrop's argument regarding the reimbursement rate is similarly unavailing. Section 8.5 sets a contract rate of reimbursement that hypothetically could be higher or lower than the actual cost incurred due to retesting. Setting a contractual rate, as the parties did here, accounts for the risk associated with the FSS machine failing the first article test and needing retests. Northrop's attempt to narrow the category of personnel it would reimburse also defies the plain reading of section 8.5 that reimbursement covers the USPS Test Director, a singular person from the Postal Service, and any other test personnel that the Postal Service uses. There is no inherent limit in the phrase "other test personnel" to Postal Service employees. We deny Northrop's motion for summary judgment on count five.

### 6. Count Seven: On-Site Software Testing and Support

The Postal Service alleges in count seven, paragraphs 103-106, that Northrop had a contractual duty to provide on-site support for Pre-Beta and Beta testing of Software Release 2.5.4 and that it failed to do so.[6] Northrop moves for partial summary judgment on count seven, arguing that the Postal Service's contemporaneous documents demonstrate that Northrop offered to provide on-site support but that the Postal Service declined Northrop's offer. The Postal Service contends that there is a genuine dispute regarding whether Northrop provided on-site support.

---

[6] On June 11, 2018, the court granted the Postal Service's motion to amend its counterclaim, including these paragraphs, to specify that Northrop failed to provide the on-site software testing support rather than more broadly stating that Northrop failed to perform its software testing obligations under SOW E. The parties agree that Northrop did not have an obligation to perform the testing of the Pre-Beta and Beta software release.

SOW E 6.0 covers software testing. Section 6.4 states, "After successful completion of all development testing and once code corrections are made and re-tested, the Supplier shall provide on-site support when the USPS Engineering or designated test contractor is present during Pre-Beta and Beta testing." *Id.* at A2121. Northrop cites emails to show that Northrop offered, and the Postal Service declined, Northrop's on-site support. We note, however, that Northrop does not cite correspondence from Northrop's software manager, or anyone else from Northrop, offering to perform the support. Instead Northrop cites a January 2012 email in which the Postal Service software manager states, "I met Cathryne [Northrop's software manager] and obtained the 2.5.4 media and stated, we would do the testing." Pl.'s Reply A2786. The email provides no more information about that conversation. The sentence does not refer to Northrop's support obligation. The cited correspondence does not refer to testing or support again.

On the other hand, in deposition testimony, the Postal Service stated that Northrop was required to support testing, but Northrop "did not come and support us on the pre-beta. They did not come and support us on the beta." Pl.'s Mot. Summ. J. A1708; *see also* Pl.'s Reply A2795. Northrop's citations do not establish an absence of dispute over whether Northrop provided on-site support when the Postal Service tested the software. We deny Northrop's partial motion for summary judgment on count seven.

### 7. Count Eight: Breach of Warranty

The Postal Service alleges in count eight that the contract required Northrop to provide warranty coverage for defects in FSS machines from the acceptance of the first FSS machine until nine months after the acceptance of the twelfth FSS machine. The Postal Service argues that it invoked its warranty coverage for twenty-six design defects by letter to Northrop dated June 9, 2011. Pl.'s Mot. Summ. J. A2195-A2198. Northrop responded August 10, 2011, denying the validity of the claims.

In the April 2012 final decision, the contracting officer asserted a claim against Northrop for "Design Warranty Issues," and concluded that Northrop owed the Postal Service $4,797,151 "in consideration for the design warranty tasks not performed." *Id.* at A947. The contracting officer provided a spreadsheet that listed twenty-one alleged defects. *Id.* at A966A-A966C.

The Postal Service now alleges that Northrop breached the contract by refusing to fulfill its contractual warranty obligations regarding the defects that the Postal Service identified in its letter, leading to $4,425,496

in damages. The Postal Service's engineer identified in his damages estimate four additional alleged defects that were not listed in the contracting officer's final decision.[7] *Id.* at A2198-99. The final number of warranty claims is twenty-six, the same number and type as were identified in the June 2011 letter.

Northrop agrees that the contract required it to provide certain warranty coverage, but contends that the Postal Service did not raise the claims properly under the contract's warranty provisions. Before turning to the warranty provisions, Northrop moves to dismiss warranty claims that do not include an assertion of damages on the Postal Service's design-warranty damages spreadsheet.[8] Pl.'s Mot. Summ. J. 71 n.29. The Postal Service agrees, "[N]o damages for those items are claimed. Consequently, there is no portion of Count VIII based upon these items, and there is nothing to dismiss." Def.'s Resp. 83-84. Insofar as concerns those six items, we grant Northrop's motion to dismiss.

Northrop also contends that the four claims that were not included in the contracting officer's final decision must be dismissed. Northrop notes that for Nos. 3 and 10, the Postal Service has not alleged any damages relating to the defect. Regarding those two claims, the Postal Service agrees: Nos. "3 and 10 are not issues for which the Postal Service asserts damages, and so are not part of a claim in this litigation." *Id.* at 87. Thus, on Nos. 3 and 10, we grant Northrop's motion to dismiss.

Regarding Nos. 21 and 24, the Postal Service argues that they "were combined with items 15 and 23, respectively, in the contracting officer's analysis" and that the contracting officer broadly stated his decision concerned the items identified in the June 9, 2011 letter. Def.'s Resp. 87, A1777, A1812-14. No. 21 is a claim for defect in the "CASTR Guide Hardware" and No. 15 is a claim for defect in the "Left CASTR Guide Rail." No. 24 is a claim for defect in the "FSS Electrical Cabinet Disconnect Switches" and No. 23 is a claim for defect in the "ITC Electrical Cabinet Disconnect Switches." In both of these cases, the item involved is hardware, the same hardware is implicated in both claims, and the difference between the contracting officer's final decision and the claim currently before the court is a matter of modifying or adjusting the same claim to be more specific. We deny Northrop's motion to dismiss claims on Nos. 21 and 24.

---

[7] These are claim Nos. 3, 10, 21, and 24.
[8] These are claim Nos. 12, 13, 19, 20, 22, and 25.

The question on the remaining eighteen warranty claims is whether the contract unambiguously provides for a particular process by which the Postal Service was required to raise each warranty claim. This is a legal question, the answer to which begins with identifying the contract's warranty provisions.

In Award Data Sheet paragraph 23, Northrop "warrants to (1) correct design defects including the retrofit/replacement of accepted, installed, and work in process systems, assembly process, parts storage, site and depot kits, pending replenishment orders, maintenance and training documentation and course materials at no additional cost to the Postal Service for a period beginning at first system acceptance and ending 9 months after the acceptance of the 12th production field system  . . . ." Pl.'s Mot. Summ. J. A116.

Clause 2-8 Warranty (March 2006) (Modified) provides,

a. The supplier warrants for the period at acceptance of any supplies beginning at acceptance of the first system and ending at one year after the acceptance of the final (100th) system, that all supplies furnished under this contract, including packaging and markings, will be free from defects in material or workmanship and will conform with the specifications and all other requirements of this contract.

b. Within the warranty period specified above, the contracting officer must give written notice to the supplier of any breach of warranty and either:
(1) Require the prompt correction or replacement of any defective or nonconforming supplies; or
(2) Retain them, reducing the contract price by an amount equitable under the circumstances. . . .

f. Repair, correction or replacement in the manner provided above shall constitute fulfillment of Seller's obligations under this assurance. Such assurance shall apply to design, but not to any equipment or parts which have been subject to accident, misuse or unauthorized alteration . . . . The procedure for evaluation of design failures and remedies for design defects shall be as stated in Section A11.0 – A11.3 of the Statement of Work. This assurance shall apply to and include correction of Technical Data pertinent to defective work and equipment as the extent delineated. This warranty concerns hardware and not

computer software. The warranties for computer software are
provided in Clause 4-13, Software License Warranty and
Indemnification (March 2006), and Clause 4-14, Software
Development Warranty (March 2006). Nothing in this clause
shall be construed to negate any provisions of the Statement of
Work, including but not limited to those referring to the Failure
Reporting, Analysis and Corrective Action Systems
(FRACAS).

      g. The foregoing covenants are exclusive and are in lieu
of any warranty of merchantability, fitness for particular
purpose or other warranty of quality, whether express,
statutory or implied. In no event shall seller be liable for
special, indirect, incidental, or consequential damages
resulting from any defects or deficiencies in accepted items. . .
.

*Id.* at A68 (emphasis omitted).

Clause 2-8 refers to SOW A 11.0 through 11.3 for the procedure to
evaluate design failures and remedies for design defects. SOW A section 11.0
states, "The manufacturer shall warrant each and every FSS unit/system to
be free from defects in material, workmanship, and design for the period
starting at first system acceptance through one year after the acceptance of
the final (100th) field unit. The warranty provided within [Clause 2-8]
applies to all requirements of this SOW." *Id.* at A2059.

Sections 11.2 and 11.3 provide the "PC Board Warranty" and for
"Burn-In of Electronic Components," respectively. Section 11.1 states,

The Supplier shall provide for the replacement/retrofit of failed
parts due to defects in materials, workmanship, and design.
Any replacement/retrofit shall include all systems, parts,
updates to the system technical data and logistic support
deliverables, each at no additional cost to the USPS.

The Supplier shall implement a Failure Reporting, Analysis,
and Corrective Action System (FRACAS) process per the
requirements in this Section and in conjunction with
requirements in Sections D, F, H, J, and M.

The FRACAS program shall collect failure data, receive and
store failed hardware, document all failure events in a common

27

FRACAS database, analyze all failure data and perform failure analysis to determine if a trend has occurred. Failure Analysis is defined as performance to a) verify a failure, and b) isolate a failure to FRU, subassembly and/or piece-part.

Once a failure trend has been identified, the Supplier shall perform detailed root cause analysis on all trend failures, and implement and/or recommend the appropriate corrective action to prevent failure recurrence. . . . A failure trend is defined as 3 or more of the same unit part number failing in the population of FSS, when the FRU/component has a population of 10 or less in each FSS. . . .

The Supplier shall design/develop, propose and implement corrective actions for all failure trends at no additional cost to the USPS.

Based on the root cause analysis results, trend failures shall be separated into the following failure categories:
1. Design defects,
2. Manufacturing defects.
3. Physical or functional degradation below specification limits. . . .

Based on root cause analysis and the failure categorization, applicable corrective measures shall be proposed by the Supplier or review and acceptance by the USPS prior to Supplier redesign, retrofit or support process change. The Supplier proposed corrective action must include retrofit of deployed systems, modification of any logistic support system affected by the corrective action or impacted by a change to the unit design, where applicable. The Supplier shall perform such corrective actions at no additional cost to the USPS. . . .

Corrective measure options shall include, but are not limited to, the following:
1. Hardware design modification.
2. S/W and/or firmware modification. . . .

The Supplier shall not implement any corrective action without USPS review of root cause analysis and approval of proposed corrective actions. Any Supplier proposed corrective action

must not increase USPS maintenance workload, unless
approved by the Contracting Officer.

*Id.* at A2059-60.

Finally, Clause 4-14 Software Development Warranty (March 2006)
(Modified) provides,

> If any time during the 12-month period immediately following
> acceptance, the supplier or the Postal Service discovers defects
> or errors in the software or any respect in which the software
> fails to conform to the provisions of any other warranty
> contained in this contract, the supplier must, entirely at its own
> expense, promptly correct the defects, errors, or nonconformity
> . . . as may be necessary to keep the software in operating order
> in conformity with the warranties in this contract.
>
> The Postal Service will provide written notice of the defects,
> errors or nonconformity to the Supplier within the 12-month
> period immediately following acceptance of the software. The
> foregoing covenants are exclusive and are in lieu of any
> warranty of merchantability, fitness for particular purpose or
> other warranty of quality, whether express, statutory or
> implied.

*Id.* at A82 (emphasis omitted).

Based on the foregoing provisions, Northrop argues the Postal Service
was required to raise the alleged defects through the contractually-prescribed
process. Northrop purports to divide the claims into software, hardware, and
mixed defect claims, each of which must have been raised under a specific
provision. Specifically regarding the ten claims[9] it regards as software
defects, Northrop argues that the exclusive warranty clause was Clause 4-14.

The Postal Service cited Award Data Sheet paragraph 23 in its June
2011 letter and in the contracting officer's final decision. Paragraph 23 states
a warranty for design defects. It does not list any particular means to invoke
the warranty. It provides that design defects include the systems, assembly
process, various claims related to spare parts, and maintenance and training
materials. Even reading the "including" clause to limit the phrase "design
defects," the items on the Postal Service's list appear to relate to the system,

---

[9] These are claim Nos. 2, 4, 5, 8, 9, 17, 19, 20, 22, and 25.

its assembly, and the FSS machine parts. Northrop's argument that this paragraph is too narrow to include any of the claims is inconsistent with the broad term "design defects" and the accompanying examples.

We disagree that Clause 4-14 provides the exclusive remedy for the Postal Service's claims. The contract unambiguously provides, in Clause 4-14 and elsewhere, several software warranties. Clause 4-14 itself explicitly states that if there is a software defect or the software does not conform to any other warranty provision, the Postal Service may inform Northrop and Northrop must correct the defect, error, or nonconformity. Clause 4-14 goes on to repeat the assurance that the software must operate in conformance with the warranties—plural—in the contract.

Not only does Clause 4-14 state twice that software must conform to all warranty provisions, Clause 4-13 and SOW A 11.4 provide two other software-specific warranties. In Clause 4-13, Northrop warrants that it has "full power and authority to grant the rights contained in this contract with respect to the software without consent of any other person." Pl.'s Mot. Summ. J. A82. SOW A 11.4 provides a software warranty, stating, "In addition to the basic warranty described in the contract, the Supplier shall provide a software design warranty for the period through six (6) months after acceptance of the last production FSS. The software design warranty provides software corrections from defects beyond the standard warranty coverage and scope." *Id.* at A2060. The contract contradicts Northrop's argument that Clause 4-14 was the sole remedy the Postal Service had for software defects.

Notably, even if we agreed that the Postal Service's software defect remedy was to invoke the Clause 4-14 warranty, the Postal Service fulfilled the procedure set out in that clause: provide written notice of the defects. If Northrop had responded to the Postal Service's June 2011 letter stating that Clause 4-14 was the proper warranty to invoke, the Postal Service would need to change nothing about its claim to satisfy Clause 4-14's procedure. Presumably, Northrop is arguing that the notice must state, "The Postal Service relies on Clause 4-14." We find that the terms of Clause 4-14, read together with the other warranty provisions, do not bar the Postal Service from citing Paragraph 23 for its claims or require the Postal Service to expressly mention Clause 4-14.

Shifting from software to hardware, Northrop contends that sixteen warranty claims are hardware claims that must be asserted under Clause 2-8's warranty for supplies, including related services. It makes the distinction that the clause provides a warranty for hardware, not software. To invoke

Clause 2-8, the contracting officer make the claim in writing and either require Northrop to repair or replace the parts or state the Postal Service's intention to retain the supplies and reduce the contract price accordingly.

The Postal Service contracting officer informed Northrop of its breach in writing. Nothing in Clause 2-8 requires the Postal Service to literally state, "We invoke Clause 2-8." And the Postal Service instructed Northrop to respond with a plan to correct the design defects, including "[r]ecommend when and how the retrofit or replacement will occur, i.e. replace all parts immediately in field and depot, replace as fail, etc. Provide date when retrofit or replacement of each item will be complete." *Id.* at A2196.

Moreover, both Clause 2-8 and Award Data Sheet paragraph 23 provide a warranty against design defects. The list following "design defect" in Paragraph 23 includes at least two types of hardware: the FSS machines and the accompanying spare parts. We find that the Postal Service met its Clause 2-8 requirements to invoke the Clause 2-8 warranty and that there is nothing inconsistent in expressly invoking Paragraph 23.

Related to Northrop's hardware defects argument is its argument that the contract provided an exclusive process for identifying defects and resolving them: FRACAS. We disagree. SOW A 11.1 reiterates the Section 11.0 warranty guaranty and then launches into a lengthy process for Northrop to identify failure trends and how to correct trends that Northrop discovers. The Postal Service does not perform or trigger FRACAS. It is a free-standing review process related to discovering and resolving failure trends. Taking section 11.3 at face value means that the FRACAS process occurs without impeding the design defect warranties provided in Section 11.0, Clause 2-8, and Award Data Sheet paragraph 23. We find that the FRACAS process does not preclude the Postal Service from invoking the warranties provided in the contract. Northrop's argument that the hardware-related claims must be subject to FRACAS prior to being a valid claim is thus unavailing.

In sum, Award Data Sheet paragraph 23 provided a warranty that includes these design defects claims, the other warranty clauses did not preclude the Postal Service from invoking Paragraph 23, and the Postal Service met the requirements under any of the three clauses to invoke the warranty for a design defect. We deny Northrop's motion for summary judgment on the warranty claims except Nos. 3, 10, 12, 13, 19, 20, 22, and 25, on which we granted Northrop's motion to dismiss.

8. Count Nine: Repudiation of the Life Cycle Support

In count nine, the Postal Service alleges that it will sustain $1,880,800 in damages due to Northrop repudiating its obligation to provide life cycle support for the FSS machines. Northrop argues that it is entitled to summary judgment because the undisputed facts demonstrate that Northrop did not repudiate its obligation to provide life cycle support.

SOW H 6.0 covers life cycle support. It begins with a summary of Northrop's life cycle support obligations: "to provide adequate sources for purchase of commercially available items for the life of the equipment; . . . to provide adequate technical data for the life of the system not just during the initial phases of the equipment life; . . . to document life-cycle support in a Life Cycle Support Plan." *Id.* at A2291. The section proceeds to detail how Northrop will accomplish the three goals.

To demonstrate Northrop's purported repudiation, the Postal Service cites to Postal Service deposition testimony that Northrop had ended the FSS program, to an internal email indicating that Northrop was ending the program, and to other communications and deliverable spreadsheets indicating that Northrop was closing out its obligations to the program at a time when it had not confirmed its continuing life cycle support obligations. Def.'s Resp. 88-89. To demonstrate that Northrop did not perform life cycle support, the Postal Service cites to agency-generated Problem Reports, which it explains are part of the basis for its damages claim. *E.g.*, Pl.'s Mot. Summ. J. A1764.

The Postal Service does not provide a citation to any document in which Northrop unequivocally states it would not perform the duties listed in SOW H 6.0 or that it did not intend to provide life cycle support to the Postal Service. Northrop in fact submitted a life cycle support plan as called for in SOW H 6.0. *Id.* at A2311-2320. The Postal Service also does not suggest that it contacted Northrop for any life cycle support or to fulfill a specific aspect of parts sourcing called for in SOW H 6.0.

Northrop's internal communications are not sufficient to create a reasonable inference that Northrop repudiated its obligation to accomplish three specific tasks, particularly when Northrop accomplished one of those tasks–submitting the support plan. Likewise, citations to Problem Reports, without a tie to an obligation in SOW H 6.0 and without citation to when the Postal Service made Northrop aware of these problems, is not sufficient to support an inference that Northrop refused to perform life cycle support related to parts. Because there is no genuine dispute of material fact and

because the undisputed facts cannot reasonably support a conclusion that Northrop repudiated or failed to perform its life cycle support obligations, we grant Northrop's motion on the Postal Service's count nine.

> B.    Defendant's Partial Motion for Summary Judgment

The Postal Service moves for partial summary judgment on Northrop's counts three, four, and five, and for summary judgment on Northrop's count one and seven. Because we granted the Postal Service's motion to dismiss Northrop's count one asserting a cardinal change, we need not consider the alternative motion for summary judgment on the same count.

For the reasons set out below, we deny the Postal Service's motion regarding the delay in beginning Phase III Maintenance Training, relating to count four paragraphs 69-71. We grant the Postal Service's motion regarding failure to provide on-site representatives to manage handbook disputes, stated in count five ¶ 258(f). We grant-in-part the Postal Service's motion regarding Northrop's count five. Finally, we grant the Postal Service's motion for summary judgment on count seven regarding a defective specification.

> 1. Count Four ¶ 69-71: Phase III Maintenance Training

Northrop alleges that the Postal Service delayed Phase III Maintenance Training by rejecting Northrop's handbook submission and requiring Northrop to submit a handbook that went beyond the contract's requirements. The Postal Service argues that the contract unambiguously provided that the handbook had to be complete to begin training and that Northrop's handbook was not complete, thus precluding a delay and disruption claim. The disputed provision of the contract is in Mod. 7:

> The FSS Phase III Maintenance Technician course training validation will not begin until the Postal Service determines the following requirements have been met, and then gives Supplier approval to proceed: a. FSS Phase-II Maintenance Technician training course; b. Supplier validated PH1-1 electronic handbook; and c. Preliminary MDSS functionality, in accordance with ATTACHMENT A, Table 1.

Def.'s Mot. Summ. J. A1114-15.

Mod. 7 sheds no light on the standard for completeness. Northrop and the Postal Service advance different interpretations of the content required in

PH1-1 handbook before training began. Northrop cites to communications with the Postal Service leading up to and after July 2009 concerning what had to be included in the handbook to begin training. The Postal Service cites to other contract provisions on standards for the handbook deliverable as well as communications between the parties at the time.

We find that Mod. 7 introduced ambiguity into the contract regarding the contents of the PH1-1 handbook. The contract provisions regarding the FSS maintenance handbook do not clarify whether the handbook was permitted to be partial or was required to be complete. Both parties have provided extrinsic evidence regarding the meaning of "Supplier validated PH1-1 electronic handbook". The Postal Service advances a reasonable interpretation of the clause. There is a fact question regarding what the parties intended to be in the handbook prior to Phase III Maintenance Training and whether the Postal Service interfered with the submission of the handbook. We deny the Postal Service's motion for summary judgment regarding the delay in beginning Phase III Maintenance Training, as asserted in count four and to the extent it is asserted in other counts.

2. Count Five ¶ 258(f): On-Site Representatives

As part of count five's constructive change claim 46, Northrop alleges that the Postal Service caused additional costs from 2007 to 2009 by failing "to have representatives on site" at Northrop with the authority to resolve certain disputes. Pl.'s Am. Compl. ¶ 258(f). The Postal Service moves for summary judgment on this portion of claim 46 on the grounds that the contract did not require the Postal Service to provide on-site representatives at Northrop to resolve disputes related to the handbook.

Northrop does not cite to a contract provision requiring the Postal Service to provide such support. Instead, Northrop argues in its response to the Postal Service's motion that the Postal Service breached its duty of good faith and fair dealing by failing to provide the on-site support. Northrop argues that it justifiably expected such support to avoid and quickly resolve handbook-related disputes. The Postal Service responds that Northrop's only support for such an obligation are pre-contract expectations that were not incorporated in the contract. The Postal Service contends that Northrop cannot use the implied duty of good faith and fair dealing to expand the Postal Service's substantive duties.

The implied duty of good faith and fair dealing acts as a complement to the duties expressly provided for in the contract by preventing either party from interfering in performance or acting in a manner that deprives the other

party of the benefit of the contract. *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014). A party need not point to an express contract provision that has been violated to invoke this implied duty, but it cannot use the implied duty of good faith and fairing dealing to create duties inconsistent with the express terms of the contract. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829-31 (Fed. Cir. 2010); *Centex Corp. v. United States*, 395 F.3d 1283, 1304-07 (Fed. Cir. 2005).

Northrop cites to its November 2006 pre-contract technical proposal in which it included language demonstrating that it expected on-site support. No such commitment was incorporated into the contract, however, and Northrop has not cited to any communication during performance that would suggest the Postal Service acknowledged the need for on-site agency support or that it agreed to provide it as a precondition to Northrop's performance. The parties made specific provision in the contract governing handbook deliverables that does not include on-site support. We therefore grant the Postal Service's motion for summary judgment regarding Northrop's assertion that the Postal Service failed to provide on-site support for handbook-related disputes in count five paragraph 258(f) and to the extent it is asserted in other counts.

### 3. Count Five: Discretely Priced Constructive Changes

Northrop's count five claims damages for 50 discretely priced constructive changes regarding hardware-related design, totaling $42,712,265. The Postal Service moved for summary judgment with respect to the first 43 constructive-change claims enumerated in complaint paragraphs 75 through 244, $11,012,625 of the total claimed for constructive changes. The Postal Service argues that (1) Northrop has not identified a Postal Service representative with contracting authority who gave a direction constituting a change and (2) Northrop cannot establish that it gave the Postal Service timely notice that it viewed such direction as beyond the scope of the contract.

Advancing a gestalt view of its constructive change claims, Northrop contends that it "has provided a compilation of evidence that, read as an integral whole, raises genuine issues of material fact regarding the notice and direction elements of a change." Pl.'s Sur-Reply 7. This 'whole-is-greater-than-its-parts' approach cannot suffice, however, if there is an absence of any specific evidence of authority or notice. Instead of addressing the 43 claims individually, we will address Northrop's theories of authority and notice underlying these claims, using individual claims to test Northrop's argument.

We begin with the theory of constructive change. When a contracting officer, without issuing a formal change order, requires the contractor to perform work that it regards as being beyond the contract requirements, the contractor may elect to treat the contracting officer's directive as a constructive change and pursue an equitable adjustment. *See Ets-Hokin Corp. v. United States*, 420 F.2d 716, 720 (Ct. Cl. 1970). The Changes Clause in the FSS production contract provides:

> (1) The contracting officer may, in writing, without notice to any sureties, order changes within the general scope of this contract in the following: (a) - (f) . . . .
> (2) Any other written or oral order (including direction, instruction, interpretation, or determination) from the contracting officer that causes a change will be treated as a change order under this paragraph, provided that the supplier gives the contracting officer written notice stating (a) the date, circumstances, and source of the order and (b) that the supplier regards the order as a change order.
> (3) If any such change affects the cost of performance or the delivery schedule, the contract will be modified to effect an equitable adjustment.
> (4) The supplier's claim for equitable adjustment must be asserted within 30 days of receiving a written change order. . . .

Def.'s Mot. Summ. J. A77-78.

A successful constructive change claim thus requires demonstration of (1) authority to direct Northrop to perform work beyond the contract's scope and (2) written notice that Northrop regarded the direction as a change order.

### a. Authority

Turning first to authority, for six of its claims, Northrop argues that the contracting officer provided the direction that constituted a change. On another nine of the claims, Northrop argues that a Postal Service contract specialist had actual authority to give the direction. For the remaining claims, and in the alternative on the fifteen referenced in the two preceding sentences, Northrop argues that the contracting officer ratified a direction given by non-authorized Postal Service personnel. Additionally, on all but four of the claims, Northrop argues that the Postal Service admitted in its answer that the direction was given by authorized personnel and that

Northrop informed the Postal Service that it regarded the direction as a change order.

### i. Direction from Contracting Officer

The contract expressly states that the contracting officer is the Postal Service official with the authority to give an informal order that may be considered a change. Northrop argues the contracting officer gave a direction that amounted to a change in claims 15, 17, 18, 24, 29, and 39.

Claim 39 was the only claim for which we could readily ascertain that the contracting officer may have directed the work himself. In claim 39, Northrop asserts that certain electrical cabinets were contractually required to have warning labels. After Northrop designed what it alleges were compliant labels, the Postal Service directed Northrop between October 2007 and January 2008 to change them. Later, in a September 2008 letter, contracting officer David Milnes wrote that Northrop "must resolve all of these non-compliant issues," including changing the labels. Def.'s Supp. App. Vol. 5 A886-911. That September 2008 letter to Northrop is followed by citations to similar letters from the contracting officer characterizing the labels as noncompliant. The Postal Service concedes in its motion that these letters would be sufficient to demonstrate an authorized direction to do the work, but it points out that Northrop offers no evidence that it viewed the direction as a change order.

For the other claims Northrop provides lists of citations and states that the contracting officer directed the change among many other asserted authorization theories. Our review reveals that, by and large, these citations do not point to any evidence that the contracting officer was the person who directed Northrop to perform the work at issue. If Northrop can cite to direct communication, written or verbal, from the contracting officer, such as the letter supporting claim 39, we agree that there is a fact question regarding whether the contracting officer provided the direction. For any claim that Northrop cannot cite to such direct communication, Northrop's argument that the contracting officer directed the change fails.

### ii. Implied Actual Authority

Northrop alternatively relies on implied actual authority regarding nine of its constructive change claims.[10] "Actual authority may be either

---

[10] Northrop argues implied actual authority regarding claims 3, 7, 15, 17, 18, 24, 27, 30, and 38.

express or implied." *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1402 (Fed. Cir. 2016). "An employee of the Government has implied actual authority to enter an agreement only when that authority is an 'integral part of the duties assigned to [the] government employee.'" *Id.* (quoting *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal quotation marks omitted)). "Authority is integral 'when the government employee could not perform his or her assigned tasks without such authority.'" *Id.* (quoting *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)). Furthermore, this court has held that implied actual authority cannot exist where the agency's regulations grant the authority at issue to other agency employees. *Flexfab, LLC*, 62 Fed. Cl. at 148 (citing *Roy v. United States*, 38 Fed. Cl. 184, 189-90 (1997)); *see also Leonardo v. United States*, 63 Fed. Cl. 552, 557 (2005), *aff'd*, 163 F. App'x 880 (Fed. Cir. 2006).

As a general matter, the Federal Circuit has distinguished between actual and apparent authority. Apparent authority exists when "an agent with no actual authority holds himself out to have such authority to another's detriment." *Liberty Ammunition, Inc.*, 835 F.3d at 1401. "A Government agent must have actual authority to bind the Government to a contract. . . . [T]he Government is immune to actions of its agents who merely possess apparent authority." *Id.* (internal citation omitted). "A contractor who enters into an arrangement with an agent of the government bears the risk that the agent is acting outside the bounds of his authority, even when the agent himself was unaware of the limitations on his authority." *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993) (internal citations omitted).

The contract vests the authority to give a direction that constitutes a change in the contracting officer. Postal Service regulation effective November 2007, 39 C.F.R. § 601.104 (2018), provides,

> Only the Postmaster General/CEO; the Postal Service's vice president, Supply Management; contracting officers with written statements of specific authority; and others designated in writing or listed in this part have the authority to bind the Postal Service with respect to entering into, modifying, or terminating any contract regarding the acquisition of property, services, and related purchasing matters.

Northrop does not argue that Mr. Batts was a contracting officer, that his role (contract specialist) was listed in Postal Service regulations as having authority to modify a contract, or that he was designated in writing to have the authority to make a change to the contract. Thus, for the changes occurred

after November 2007, the Postal Service regulations foreclose Mr. Batts having actual authority to effect changes to the contract.

Beyond the Postal Service regulation, the relevant question is what Mr. Batts' status and duties at the Postal Service in fact were. From Northrop's citations, we know that Mr. Batts was a contract specialist with the Postal Service who listed the contracting officer's name in his email signature block and copied the contracting officer on emails discussing changes with Northrop. Mr. Batts stated in deposition testimony that he included the contracting officer's name in his signature line to communicate to Northrop that he was speaking on the contracting officer's behalf. Yet Northrop did not cite any evidence, even as simple as a contractual description of Mr. Batts' duties, that would suggest his duties included giving directions that would entitle Northrop to payment from the Postal Service.

Instead, Mr. Batts' emails appear to be a classic example of apparent authority. He made statements and copied the contracting officer on those statements that would lead Northrop to believe that it received a direction from authorized Postal Service personnel, when in fact Mr. Batts did not have the authority to change the contract. Northrop's citations are insufficient to raise a genuine issue that Mr. Batts' duties included giving or ratifying directions that constituted a change to the contract, and therefore Northrop cannot rely on its implied actual authority argument to support these constructive change claims.

### iii. Ratification

Northrop next argues that the contracting officer ratified the direction in question for all 43 constructive change claims. "Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" *Schism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (quoting Restatement (Second) of Agency § 82 (1958)). Ratification occurs where the individual affirming the action "(1) possesses the actual authority to contract; (2) fully knew the material facts surrounding the unauthorized action of his or her subordinate; and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of the subordinate." *Villars v. United States*, 126 Fed. Cl. 626, 633 (2016); *see also United States v. Beebe*, 180 U.S. 343, 354 (1901) ("Where an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken.").

We discussed constructive change claims 35, 37, and 43 at oral argument. On each of these constructive change claims we find that Northrop has not cited evidence sufficient to create a justifiable inference that Northrop will be able to prove the authority and notice elements of a constructive change claim, even with its ratification theory.

Constructive change claim 35 alleges that the Postal Service directed Northrop to redesign the Street Tray Labeler cabinet to close a 5-inch opening. Constructive change claim 37 alleges that the Postal Service directed Northrop to redesign the Street Tray Labeler's tray pusher so that it applied less force against the tray. Constructive change claim 43 alleges that the Postal Service directed Northrop to make certain operator panel indicator lights larger. Northrop argues that the contracting officer ratified the unauthorized Postal Service personnel's direction. For each of these claims, Northrop argues that it is reasonable to infer that the contracting officer ratified this instruction from unauthorized Postal Service personnel and that sufficient notice was provided through discussion between the parties. Northrop adds on claim 43 that it provided notice of its election to treat this direction as a change at a safety walkthrough and through discussion with the Postal Service.

The citations for these three claims are the same: a February 9, 2011 interview of Don Crone, the FSS Program Manager for the Postal Service, and deposition testimony from Northrop Grumman's FSS Program Manager. Neither the interview nor the testimony suggest that the Postal Service contracting officer gave the direction involved in these constructive change claims. Thus, plaintiff relies on ratification of an unauthorized person's direction. Mr. Crone would have had authority to ratify a direction as the contracting officer, but knowledge of material facts and knowingly ratifying the direction simply cannot be inferred from plaintiff's citations.

The pages cited do not mention the cabinet redesign, the tray pusher design, or the indicator light enlargement. Instead, the interview and testimony contain broad discussion of the fractious, tug-of-war relationship that developed between Northrop and the Postal Service over the life of the contract. Perhaps, as Northrop argued, the contracting officer might have sat in meetings or reviewing progress reports, but these blanket citations do not create a triable question of whether the contracting officer had a full knowledge of the facts of these directions or that he knowingly agreed or acquiesced to any of the highly specific directions regarding design.

We thus grant the Postal Service's motion for summary judgment on constructive change claims 35, 37, and 43. Because Northrop's claims 2 and 5 also rely solely on these citations to support Northrop's ratification theory, we grant the Postal Service's motion for summary judgment on those claims.

### iv. Puts & Takes List, Action Items, Deliverables

Northrop lists the Puts and Takes List, PDR or CDR Action Items, Safety Directions, and related deliverables as a separate basis for demonstrating that a fact question exists regarding authority. Each of these items purports to show that the contracting officer affirmed or acquiesced to directions given by unauthorized Postal Service personnel and thus fall within a ratification theory of authority. Since Northrop discusses these items separately, however, we will address them in their own section.

The parties do not dispute that Northrop created the Puts and Takes List to provide a list to the contracting officer of what work it deemed to be beyond the scope of the contract. If an item appears on the Puts and Takes List, the Postal Service cannot demonstrate that there is an absence of dispute of material fact. Other deliverables, such as the A-30 Deliverable, or contemporaneous review notes that would be reviewed by the contracting officer also fall within the category of citations sufficient to indicate the presence of a dispute of fact regarding authority. Whether Northrop can successfully demonstrate that the contracting officer reviewed these lists within a meaningful period, i.e., within sufficient time to reign in the unauthorized Postal Service personnel, and whether the work is actually beyond the scope of the contract remains to be seen.

Northrop also alleges that Postal Service personnel gave the order through a Preliminary Design Review ("PDR") or Critical Design Review ("CDR") Action Item that Northrop was obligated to implement. Pl.'s Resp. A49. The design review process is set out in the pre-production contract SOW A. Section 6.1 states that "PDR is conducted after preliminary design efforts, but before start of detail design. This review is the first opportunity for the Postal Service to closely observe the Contractor's hardware and software design." Def.'s Mot. Summ. J. A64.

PDR included three entry criteria: "Successful completion of all action items related to the previous meetings. Published agenda (Several days prior to the conference). Acceptance of all applicable Requirements." *Id.* at A64-65. PDR also included three exit criteria: "Completion of all action items assigned to the contractor. Acceptance of any requirements due at the

PDR. Concurrence from the Government/Contractor members that all issues in the conference agenda have been addressed." *Id.*

Section 6.2 lists seven tasks for the CDR such as "[d]etermine that detail design of the configuration item under review satisfies cost schedule, and performance requirements[;] [f]or new development hardware configuration items; assess the result of producibility analyses conducted on system hardware[;] FSS software design review." *Id.* at A65. CDR includes entry and exit criteria as well. The entry criteria includes "[s]uccessful completion of all action items related to the previous conference (PDR)." *Id.* The exit criteria includes "[c]ompletion of all action items assigned to the contractor" and "[c]oncurrence from US Postal Service/Contractor members that all issues in the review agenda have been addressed." *Id.* at A66.

This section does not state who will be present at the reviews. It does not provide who assigns action items or their content. Northrop does not suggest that the mere inclusion of an action item at either review would mean that it was within or beyond the scope of the contract and, in any event, whether Northrop viewed it as a change order. We agree with the Postal Service that Northrop cannot rely on the PDR or CDR Action Items *alone* to support an inference of ratification. Northrop itself appears to concede that it cannot "rely on any 1 document to establish a genuine issue with respect to" authority or notice, but, because Northrop relies on this method as one theory of authority and notice, we include this clarifying point. Pl.'s Sur-Reply 7. Constructive change claim 1 is an example of this reliance on the PDR or CDR action items, and the similar Mandatory Safety Direction, on their own that does not demonstrate that support a triable question on authority.

The contracting officer hypothetically could provide a direction that constituted a change and that the vehicle for that direction was a PDR or CDR action item. Alternatively, an unauthorized Postal Service employee might direct a change and include it on the Action Items list that the contracting officer would ultimately affirm. Thus, to the extent that Northrop had included the PDR and CDR Action Items as one type of list, among many, we agree that the action items raise an inference that the contracting officer might review and affirm in the course of performance.

iv. Admission

In addition to its arguments regarding authority at or near the time the direction was given, Northrop argues that, "with regard to 39 of the constructive changes challenged in the Motion, the USPS has either: (1) admitted in its Answer that effort was directed by USPS personnel, or (2)

averred that USPS personnel instructed NGSC to address particular design issues."[11] Pl.'s Resp. 30. Northrop is not arguing that the answer admits that the contracting officer directed the effort at issue or that Northrop provided written notice to the Postal Service that it regarded the direction as a change order. Instead Northrop argues, "[i]mplicit in these admissions that the USPS 'directed' or 'required' NGSC to act is the authority of the person 'directing' or 'requiring' such action to do so," *id.*, or, at the very least, that the answer raises a triable question of fact as to authority or notice.

This argument is a bridge too far. We use claims 1 and 35 as examples of how Northrop's admission theory does not raise a triable issue of fact as to authority or notice. Northrop asserts claim 1 in paragraphs 75 through 78. Northrop states what the original belt width was per the contract and then alleges that the Postal Service insisted on a change to the width among "a number of other Postal Service preferences." Pl.'s Am. Compl. ¶ 76. In its amended answer, the Postal Service admits the contractual width of the belt and then states that the balance of the count constitutes conclusions of law or, to the extent they are considered allegations of fact, denies those facts. The Postal Service adds that in 2007 it identified "aspects of Northrop's design that were inconsistent with the contract." Def.'s Am. Answer ¶ 76.

Northrop asserts claim 35 in paragraphs 210 through 213. Northrop states that it designed the Street Tray Labeler cabinet with a 5-inch opening on the back side. Northrop goes on to allege that the Postal Service directed Northrop to re-design the labeler cabinet to close the 5-inch opening and that this change was beyond the scope of the contract's requirements. In its amended answer, the Postal Service admits that Northrop designed the cabinet with the 5-inch opening. The Postal Service states that the balance of the count constitutes conclusions of law or, to the extent Northrop's allegations are considered allegations of fact, denies those facts. The Postal Service again adds that in 2007 it identified "aspects of Northrop's design that were inconsistent with the contract." Def.'s Am. Answer ¶ 211.

The tension between the parties' statements is whether changing the belt width or the cabinet opening was work that Northrop performed beyond the scope of the contract or if Northrop had completed work inconsistent with the contract. The Postal Service's contention that Northrop's work was "inconsistent with" the contract is not an admission that an authorized representative directed work beyond the scope and that Northrop then

---

[11] Northrop argues that the Postal Service's answer admits authority and notice on every constructive change claim *except* claims 10, 28, 37, and 43.

notified the Postal Service in writing that it would treat the direction as a change.

We have reviewed Northrop's amended complaint and the Postal Service's amended answer regarding the remaining 37 constructive change claims. As with the above claims, the Postal Service did not concede the elements of authority or notice and did not inadvertently create triable questions of fact by framing their amended answer to suggest that authority or notice existed regarding the constructive change claims.

In sum, we grant the Postal Service's motion for summary judgment with respect to constructive change claims 1, 2, 5, 35, 37, and 43. As to the remaining constructive change claims, plaintiff's response to the Postal Service's argument that the undisputed facts demonstrate that Northrop failed to adhere to the contract's changes clause was to provide hundreds of pages of documents to the court regarding authority and notice for each claim. When we reviewed the citations using Northrop's chart, we found that the following arguments and accompanying citations are unavailing to create even an inference in plaintiff's favor that proper authority existed for the direction: that the contracting officer directed the change when there is no direct communication from the contracting officer; implied actual authority of Mr. Batts; relying solely on the citations listed for claims 35, 37, and 43; the PDR or CDR action items standing alone; or admissions in the Postal Service's amended answer.

### b. Notice

We turn now to whether Northrop notified the contracting officer in writing that it elected to treat the direction as a change order, keeping in mind that the purpose of the notice provision is to give the government the opportunity to mitigate costs associated with making the change. The government will be prejudiced by the lack of notice if receiving notice would have allowed the government to mitigate the cost or if time has obscured the claim. *See Shepherd v. United States*, 113 F. Supp. 648, 651–52 (Ct. Cl. 1953); *Ace Constructors, Inc.*, 70 Fed. Cl. at 272.

Northrop contends that it gave sufficient notice in at least one of eleven ways and, in most instances, Northrop argues that it notified the Postal Service by more than one means. Northrop's theories of sufficient notice, drawn from plaintiff's chart listing its theories of authority and notice and its accompanying citations, are as follows: (1) the order was in a letter sent to or received from a contracting officer; (2) Northrop discussed the order with the Postal Service in an email;  (3) the order appeared on the Puts and Takes

List; (4) the order was directed through a PDR or CDR Action Item; (5) Northrop discussed the order during a PDR or CDR representation and the contracting officer reviewed the supporting materials; (6) the Postal Service provided the direction through an Action Item, documented on the Actions Item lists, discussed during TRMs, and provided monthly to the contracting officer through the A-30 deliverable; (7) the Postal Service provided the direction during a safety walkthrough or during a safety and ergonomics meeting; (8) the order appeared in a Briefing Sheet that was either prepared or reviewed by a contracting officer; (9) Northrop discussed the order with the Postal service at a TRM presentation or breakout meeting, and the order is reflected in TRM presentation slides, meeting minutes, or witness testimony; (10) Northrop discussed the order with the Postal Service (shown through testimony); and (11) that the Postal Service's answer admits the Postal Service received notice or was aware of the order.

As is immediately apparent, Northrop consistently did not follow the simple procedure set forth in the contract to notify the contracting officer that the direction provided to Northrop constituted a change. Drawing all reasonable inferences in Northrop's favor, this disorder appears to flow from the volume and pace of changes necessary due to how the Postal Service managed the program. Nevertheless, a few of these methods cannot justifiably be considered evidence supporting an inference that Northrop elected to treat a direction from anyone at the Postal Service as a change order. Because Northrop argues, as it did with respect to authority, that, taken together, its citations indicate that the Postal Service had sufficient notice, we first will use the change claims discussed at oral argument to illustrate in what respects Northrop's notice theories are insufficient.

For constructive change claims 35, 37, and 43, Northrop argues that its citations show that Northrop discussed the changes with the Postal Service, as reflected by deposition testimony. The deposition testimony is not contemporaneous with the alleged change. Moreover, these citations do not in fact suggest that Northrop notified the contracting officer, or other Postal Service personnel, in writing or otherwise, of its election to treat design directions as changes to the contract. The Northrop program manager testified that Northrop in fact considered many directions received from Postal Service personnel "changes," but equivocated regarding whether Northrop provided notice prior to the request for equitable adjustment. Regarding claim 43 specifically, plaintiff's chart supporting its notice argument lists a safety walkthrough and mandatory safety direction, but the citations do not discuss these events.

These general citations are insufficient for the court to reasonably infer that the contracting officer had notice of these directions in sufficient time to stop the change and assess the Postal Service's options. As stated in the authority section, because Northrop relies solely on these citations to demonstrate that there is a triable question regarding notice, we grant the Postal Service's motion for summary judgment on claims 2, 5, 35, 37, and 43. The government likewise cannot rely on its admission argument to support that there is a triable question on notice.

Each of the other notification methods track to citations that, when read together and favorably to the non-movant, create a triable question regarding notice. As discussed in the authority section, the back and forth between the Postal Service and Northrop on the Puts and Takes List, PDR or CDR Action Items, and other Action Items appearing in deliverables reviewed by the contracting officer, when read together, supports the inference that the contracting officer was aware that Postal Service personnel were giving Northrop design directions and that Northrop planned to follow through to successfully close deliverables. It is possible that Northrop will not be able to successfully demonstrate that this scattershot approach to notice provided the contracting officer with meaningful notice in time to alter the Postal Service's course. For now, however, the remaining methods of notice taken together are sufficient basis to deny the government's motion for summary judgment.

We therefore grant the Postal Service's motion for summary judgment on count five with respect to constructive change claims 1, 2, 5, 35, 37, and 43. As to the remaining claims, plaintiff is directed to reassert a revised list of constructive change claims on which it argues a triable question remains on authority and notice.

4.      Count Seven: Defective Specification; Count Five: Constructive Change 45

Northrop's count seven claims $973,733 in damages resulting from a defective specification regarding the requirement for the contractor to submit certain drawings to the Postal Service using Autodesk Inventor Release 10 ("Inventor 10") format. After entering into the contract, Northrop created these drawings in Mechanical Desktop and then submitted the drawings, consistent with the contract, using Inventor 10 format. The drawings created in Mechanical Desktop did not convert properly to Inventor 10. Thus, Northrop alleges that the requirement to submit drawings in Inventor 10 amounted to a defective specification. The Postal Service moves for summary judgment on this count, arguing that the parties do not dispute the

material facts underlying the claim and that those facts do not support
Northrop's claim.

SOW G 5.0 states, "All TDP deliverables shall be submitted in one or
more of the following soft-copy (electronic) file formats.

> a) All new drawings shall be submitted utilizing Autodesk
> Inventor Release 10 format. . . . Exceptions to the Autodesk
> Inventor format would be drawings such as . . . . Prior releases
> of AutoCAD and Mechanical Desktop may be used with prior
> approval from the USPS TDM. . . Should the Supplier
> determine that this requirement cannot be satisfied, the
> Supplier shall request a deviation from this requirement . . .
> b) The USPS TDM will accept drawings that have been
> submitted on previous USPS programs that are in a file format
> other than Autodesk Inventor. However, these drawings shall
> be in their original file format and previously accepted in their
> original file format by the USPS TDM.

Def.'s Mot. Summ. J. A659.

To prevail on a defective specification claim, the contractor must
demonstrate that it complied with a specification that was defective and that
the defect caused additional cost. *White v. Edsall Constr. Co.*, 296 F.3d 1081,
1084-85 (Fed. Cir. 2002). Here, Northrop cannot demonstrate that the
specification was defective. The only requirement that this section sets out is
the format in which the drawings must be submitted: new drawings must be
submitted in Inventor 10 format. There was no dispute that Northrop created
these drawings in one program and knew that the contract required the
drawings had to be submitted in another format. Northrop does not allege
that this requirement could not be met; rather it contends that it could not
convert to Inventor 10 the drawings it had created using other software. The
contract cannot be read to warrant that Mechanical Desktop would convert
to Inventor 10. Because the contractor cannot demonstrate that the
specification was defective, we grant the Postal Service's motion on count
seven.

Regarding constructive change claim 45, Northrop argues that the
contract required that Mechanical Desktop drawings be converted to Inventor
10 and that the conversion mechanism failed. The Postal Service continued
to direct use of Inventor 10 even after the conversion problem arose, until the
parties agreed to the use of Inventor 2009. Mod. 9 to the contract provided
that the Postal Service would pay the cost of upgrading to Inventor 2009.

Northrop argues in constructive change claim 45 that the Postal Service should be required to pay "the costs associated with the needless conversion of certain drawings from Mechanical Desktop to Inventor 10" because the continued use of Inventor 10 constituted a work beyond the scope of the contract. Plainly not. The agency was merely enforcing the contract as written prior to the execution of Mod. 9. The Postal Service's expectation that these drawings be submitted in Inventor 10 is within the scope of SOW G 5.0 and thus not a change to the contract. We therefore grant the Postal Service's motion for summary judgment on Northrop's count five with respect to constructive change claim 45 as it relates to Inventor 10 conversion.

## CONCLUSION

In sum, we grant-in-part plaintiff's motion to dismiss and grant defendant's motion to dismiss. We grant-in-part and deny-in-part plaintiff's motion for summary judgment and grant-in-part and deny-in-part defendant's motion for summary judgment. Plaintiff is directed to file a status report on or before November 16, 2018 in which it lists those constructive change claims on which it argues a triable question remains on both authority and notice. The parties are directed to communicate and propose a schedule for pretrial proceedings in a joint status report on or before December 7, 2018.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge